[No 1297.]

THE STATE OF NEVADA, ex rel C. H. GALUSHA, Relator, v. H. C. DAVIS, LIEUTENANT GOVERNOR OF NEVADA, Respondent.

CONSTITUTIONAL LAW—AMENDMENTS—PUBLICATION—NOTICE TO VOTERS.— The constitution (Art. 16, Sec. 1,) provides that the legislature shall submit proposed amendments to the people "in such manner and at such time as the legislature may prescribe." Stat. 1887, 122, provides for the publication of proposed amendments in one daily newspaper of general circulation, for ninety days next preceding the general election at which the amendments are to be voted on, and that as many copies of such paper shall be sent, without extra compensation, to the clerk of each county as there are registered voters therein, and by the clerk mailed to the voters. *Held*, that this act is a reasonable requirement, sanctioned by the constitution, and that amendments voted on without compliance with such requirement are inoperative. (HAWLEY, J., dissenting.)

APPLICATION for *Quo Warranto*.

The facts are stated in the opinion.

*John F. Alexander,* Attorney General, for Relator.

(Authorities cited by Relator: *National M. & C. Co.* v. *Mead,* 60 Vt. 257; *Walker* v. *Oswald,* 27 Am. L. Reg. 509.)

*T. H. Wells,* for Respondent.

(Authorities cited by Respondent: *State ex rel Stevenson* v. *Tufly,* 19 Nev. 391; *Collier* v. *Trierson,* 24 Ala. 108; Cool. Cont. Lim., 40, 750; *Koehler* v. *Hill,* 60 Iowa, 543; *State* v. *Swift,* 69 Ind. 506; *Gillespie* v. *Palmer,* 20 Wis. 544; *People* v. *Warfield,* 20 Ills. 160; *People* v. *Wiant,* 48 Ills. 263.)

By the Court, BELKNAP, J.:

At the general election of November, 1888, the people ratified a proposed amendment to the constitution of the state abolishing the office of lieutenant governor. At the same election other proposed amendments were ratified, and, among them, one changing the time for the meeting of the legislature from the first to the third Monday in January next ensuing the election of members of the assembly. A question arose in the

public mind whether these amendments were regularly adopt-
ed and became part of the fundamental law, and the governor
of the state, for the purpose of placing the matter in
such position that a judicial determination of the question
could be obtained, appointed relator to the office of state
librarian. A statute of the state constitutes the lieuten-
ant governor, as such, the state librarian. If the office
of lieutenant governor was abolished by the adoption of
the proposed amendment, it necessarily follows that he is no
longer entitled, by virtue of that office, to exercise the functions
of state librarian, and the governor's appointee should be in-
stalled. The question, then, is whether this proposed amend-
ment to the constitution has been legally adopted. The objec-
tion urged against the adoption of the amendment is equally
applicable to the proposed amendment changing the time for
the meeting of the legislature, and the conclusion to be reached
must be common to each of the proposed amendments. Sec-
tion 1, art. 16, of the constitution, prescribes how amendments
may be made without calling a convention. It reads as follows:
" Any amendment or amendments to this constitution may be
proposed in the senate or assembly, and, if the same shall be
agreed to by a majority of all the members elected to each of
the two houses, such proposed amendment or amendments
shall be entered on their respective journals, with the
yeas and nays taken thereon, and referred to the legis-
lature then next to be chosen, and shall be published
for three months next preceding the time of making such
choice; and if, in the legislature next chosen as aforesaid,
such proposed amendment or amendments shall be agreed
to by a majority of all the members elected to each house,
*then it shall be the duty of the legislature to submit such proposed
amendment or amendments to the people, in such manner, and at
such time, as the legislature shall prescribe;* and, if the people
shall approve and ratify such amendment or amendments by a
majority of the electors qualified to vote for members of the
legislature voting thereon, such amendment or amendments
shall become a part of the constitution." It is the mandate of
the constitution contained in the *italicized* portion of the above
section, that the legislature, having agreed to an amendment
proposed and agreed to at a preceding session, shall prescribe
the time and manner for the submission of the proposed

amendment to the people. In obedience to this requirement, the legislature, at the session of 1887, enacted a law entitled " An act providing for the manner of submitting constitutional amendments to the voters of the state of Nevada. (Stat. 1887, 122.) The portions of this law bearing upon the question in hand are as follows: " Section 1. Whenever the conditions prescribed by the constitution of the state of Nevada for amending the same have been complied with by the legislature, the state board of examiners shall order such proposed amendments to the constitution published in one daily newspaper of general circulation, published in the state of Nevada, for a period of ninety days next preceding any general election held in this state, when any proposed amendments are pending. Sec. 2. The publisher of the newspaper publishing the proposed amendments, as required by this act, shall print, and send to the county clerk of each county in this state, as many copies of said newspaper containing the publication of said proposed amendments as there were registered voters for the general election of 1886, and the printing and mailing of said extra copies required under this act shall be done by the publisher without expense to the state. It is hereby made the duty of the clerk of each county to mail to every registered voter within his county a copy of the newspaper containing the proposed amendments. Sec. 3. The several boards of county commissioners in this state, before the next general election after final agreement by the legislature to any proposed amendments to the constitution, shall in their proclamation order that there be printed upon the ballots: ' Amendment No. ——, Yes,' or ' Amendment No. ——, No." The publication herein required was not made of either of the proposed amendments, nor of any proposed amendment voted upon by the people at the last general election. The purpose of the act and the intent of the legislature are expressed in the title, to wit: " An act providing for the manner of submitting constitutional amendments to the voters of the state of Nevada." The law was adopted in view of the fact that at the general election of 1888 no less than eleven different proposed amendments were to be submitted to the people for their approval. With eleven separate questions to vote upon, numbered upon the ballots, respectively, amendment No. 1, No. 2, No. 3, No. 5, No. 8, No. 9, No. 20, No. 23, No. 24, No.

25, No. 27, as provided by the third section of the law above set forth, and with no convenient means generally at hand suggesting the contents or purposes of these different propositions, confusion and uncertainty would naturally arise in the mind of the voter concerning the questions upon which he was called upon to act. To remove this uncertainty, and enable the elector to vote understandingly upon the propositions presented, the legislature ordained that the proposed amendments should be published. The wisdom of the requirement is apparent, but, whatever may be said of the policy of the law, the conditions imposed are within the proper province of the legislature, and being imposed, were indispensable to a valid adoption of the proposed amendments.

It is claimed that the matter of publication is regulated by the constitution, and that the requirement of the statute in this regard is not essential to the adoption of the proposed amendments, and was not contemplated by the constitution. The constitution does require that an amendment proposed and agreed to at a session of the legislature shall be published for ninety days next preceding the succeeding election of members of the legislature, so that the people may, if they desire, elect members specially to consider it. But the constitution having unconditionally referred to the legislature the subject-matter of the manner of submitting proposed amendments, by declaring that they shall be submitted "in such manner and at such time as the legislature shall prescribe," such reasonable requirements may be imposed by the legislature as its discretion may suggest. A publication two years prior was made in obedience to the constitution, but if, in submitting the proposed amendments to the people, the legislature required another and further publication, the power to impose the requirement is expressly conferred by the language of the constitution heretofore quoted, and as follows: "It shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe." In view of the fact that no extra compensation is allowed the publisher for the extra copies of the newspaper, it has been suggested that the legislature did not consider publication and distribution essential to the submission of the amendments, and that, if these conditions had been considered essential, compensation for the services would have been allowed. If

such inference can be drawn, it would seem that it should be restricted to the extra copies for distribution; for compensation for the printing is provided for under another law. Upon the question of the reasonableness of the compensation for the services to be performed by the publisher, we are not informed further than by the law fixing the rates allowed for printing. In the absence of any showing in this regard, it is reasonable to assume, from the length and number of the amendments, and the unusual length of time during which they were to be published, and from other considerations unnecessary to mention, that the legislature considered the compensation reasonable. It results from the views stated that the proposed amendment to the constitution abolishing the office of lieutenant governor, and the one changing the time for the meeting of the legislature, were not legally submitted to the electors of the state, and have therefore failed. It is ordered that judgment be entered in favor of defendant, with costs.

HAWLEY, J., *dissenting:*

The methods of proposing and adopting amendments to the constitution are clearly defined. The provisions of the constitution in this respect are plain, simple, and explicit. The language used in the constitution is too clear to admit of doubt. "It needs no interpretation. It is so clear that interpretation could not make it clearer. It would only confuse and mystify, instead of making it plainer and more perspicuous. Its meaning is so plain that there is no room or necessity for interpretation." (*Oakland Paving Co. v. Hilton,* 69 Cal. 490.) If the legislature would do just what the constitution, in plain and unmistakable language, requires,—nothing less,—and not attempt to do anything more, then the validity of the adoption of the amendments could never be questioned. What did the framers of the constitution mean when they declared that "it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe." (Const. Art. 16, Sec. 1.) As to the time, they meant that the legislature should designate the time when the election should be held,—whether at a special or general election. As to the manner, they meant that the legislature should prescribe the method as to how the votes

thereon should be cast, — whether upon separate ballots, or upon the ballots containing the names of officers to be voted for at such election, and prescribing the manner in which the electors should express their votes.   The word "manner," as used in the constitution, does not necessarily require anything more, and was not intended to embrace anything else.   "The word 'manner' is one of large signification; but one thing is clear,—it cannot exceed the subject it qualifies or belongs to. The incident cannot be extended beyond its principal."   (*Wells v. Bain,* 75 Pa. St. 54.)   The legal definition of the word "submit" is:   "To propound, as an advocate, a . proposition for the approval of the court."   (Rap. & Law. Dict.)   When the framers of the constitution said that it should be "the duty of the legislature to submit such proposed amendment or amendments to the people, in such manner and at such time as the legislature shall prescribe," they meant that the legislature should submit the question by propounding the proposition for the approval or rejection of the voters, and that the legislature should designate the manner in which the voter should answer the proposition.   "Are you in favor of adopting amendment No. 8, abolishing the office of lieutenant-governor?   If you are, say, ' Yes;' if opposed to it, say, 'No.'"   The legislature might declare that the amendments should be printed in full on the ballots, or (what, in my opinion, would be the best and most intelligent manner) that a brief synopsis of the proposed amendment should be printed thereon, designating clearly just what the proposed amendment is.   To illustrate:   Amendment No. 1: "To change the time of meeting of the legislature to the third Monday in January.   'Yes' or 'No.'"   Amendment No. 8:   "To abolish the office of lieutenant-governor.   'Yes' or 'No;'" or to do as they did, require that the ballot should be, "Amendment No. 1.   'Yes' or · No.'"   The adoption of some specific mode was essential, and is all that was essential, in order to comply strictly with the provisions of the constitution.   If this be true, — and it certainly cannot be successfully denied, — then sections 3 and 4 of the act of March 5, 1887, substantially embody all that is demanded by the constitution; and it was unnecessary to insert the provisions of sections 1 and 2, in order to comply with the provisions of the constitution.   It is evident to my mind that the framers of the constitution did not

intend that any publication, such as provided for in sections 1 and 2, was essential. Why not? Because they did make a publication of the proposed amendments essential after they had passed both houses of the legislature at the session when they were proposed, and did not require the amendments to be published after they had been agreed to by "the legislature next chosen."

Did the legislature intend that the publication and distribution of the proposed amendments, as provided for in sections 1 and 2 of the act of 1887, should be considered as an essential part of the manner of submitting the amendments? The cumbrous machinery necessary to be used in order to carry out the provisions of these sections convinces me that the legislature did not intend that they should be strictly complied with in order to render valid the act of submitting the amendments to the people. To be consistent, it must be held that, if any of the provisions of these sections are absolutely necessary to be complied with in order to render the election valid, all are. If, therefore, any failure, either upon the part of the board of examiners to order the amendments to be published, or of the publisher publishing the same to send the required copies to the several county clerks, or of the clerks to mail a copy of the same to every voter who had his name registered in 1886, then such failure or failures would invalidate the law. Now, entertaining these views, let us look for a moment at the language of the act, in order (if we can) to arrive at the real intent of the legislature in passing it. The second section requires the publisher to print and mail to the several county clerks over 12,000 extra copies of the newspaper containing the proposed amendments, "without expense to the state." Why was this last clause inserted? The intention of the legislature was to have the publication made, as designated in section 1, provided the newspaper publisher would agree to do the extra work without any extra pay. It must be conceded that there was no direct legal method by which the courts could have enforced the duty imposed upon the publisher. True, the pay for publishing the same might have been withheld by the state, provided a contract had been made to that effect; but the act does not in express terms declare that any such contract should be made. All that the board of examiners were required to do was to "order

·such proposed amendments" to be "published." This duty upon the part of the board would have been performed by ·ordering the amendments in some designated "daily newspaper of· general circulation." Now, to enforce the views I have ·expressed, suppose the newspaper publisher had refused or failed to furnish the extra copies. What then? Would this failure have invalidated the law? I think not. To otherwise construe this act convicts the legislature of an inconsistency, at least,—of making the validity of the election depend upon acts that might not be done, and, if not done voluntarily, could not be enforced. The provisions in sections 1 and 2 of the act of 1887 were, in my ·opinion, only inserted for the purpose of disseminating a more extended knowledge of the contents of the proposed amendments. They may have been inserted in obedience to · a. demand for more information than it was claimed could be given by simply complying with the required provisions of the constitution. Conceding that these provisions ought, as a matter of public convenience and the better information of the people, to have been complied with, or, at least that an honest effort to comply therewith should certainly have been made, yet I do not think the omission was such as to invalidate the adoption of the amendments. The act of March 5, 1887, independent of the conditions prescribed in sections 1 and 2, prescribed the time and manner of the submission of the proposed amendments to the people. A large majority of the qualified electors ·of this state, at the time and in the manner prescribed by the law, voted upon the question of the adoption or rejection of the proposed amendments. The official canvass of the votes cast shows that one proposed amendment was defeated; that others were carried by a very small majority, and others adopted by an almost unanimous vote. It must, therefore, be presumed, in the absence of any showing to the contrary, that the electors acted intelligently, and had knowledge of what they were doing, and how they were voting. In view of all these facts, if the requirements ·of the constitution in all other particulars have been complied with, it seems to me that this court ought not to declare the adoption of the amendments void because the proposed amendments were not published as required by section 1.

I wish it to be distinctly understood that I adhere to the views expressed by this court in *State ex rel. Stevenson* v. *Tufly*, 19 Nev. 391, 3 Am. St. Rep. 395. The power to amend the consti-

tution resides in the people, and they have the power to change its provisions whenever in their judgment it is deemed best so to do; but their will, in this respect, can only be expressed in the modes prescribed by the constitution, and by the necessary and essential acts of the legislature relating thereto. What I claim is that when every requirement demanded by the constitution has been observed, and the time and manner of submitting the amendments to the electors, as specified in section 3 of the act of 1887, has been complied with, then it becomes the duty of the court to sustain the will of the people, regardless of the question whether or not all the forms and methods inserted in the law, for the convenience or information of the people, which do not partake of the essence or substance of the law required by the constitution, have in any or all respects been complied with. Judge Cooley, in discussing the question whether statutes are mandatory or directory, says: "Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory;" especially " if that which is done accomplishes the substantial purpose of the statute." (Cooley Const. Lim. 78, and the numerous authorities there cited). Many illustrations of this principle are to be found in the decisions of the several states relative to the validity of tax sales, where it is held that every provision of the statute that is intended for the security, benefit, or protection of the citizen are conditions precedent, and must be observed. "But many regulations are made by statutes, designed for the information of assessors and officers, and intended to promote method, system, and uniformity, in the modes of proceeding, a compliance or non-compliance with which does in no respect affect the rights of tax-paying citizens. These may be considered directory. Officers may be liable to legal animadversion, perhaps to punishment, for not observing them, but yet their observance is not a condition precedent to the validity of the tax." (Id. 77, and authorities there cited.) The same general principle is found in all of the decided cases, where the question is discussed, construing the various provisions of the election laws. All the provisions necessary to preserve the elective franchise, and protect the candidates for office, should be strictly pursued; but whenever a non-com-

pliance with the provisions of the statute, either upon the part
of registry agents, or of the officers of the election, are not
essential for these purposes, and the election is fairly and hon-
estly conducted, the electors should not, on account of such
non-compliance on the part of the officers, be deprived of their
votes. (Stinson v. Sweeney, 17 Nev. 309.) Courts, in determin-
ing these questions, always stand upon high ground, in order
to secure and reach the ends of justice, to preserve the purity of
elections, and the rights of the qualified electors to cast their
ballots and have them counted.    Technicalities are brushed
aside.   Forms not affecting the substance, although required in
direct terms by the provisions of the election law, are dispensed
with or not adhered to.   The vital questions only are considered
of controlling effect.   When the elector is legally qualified and
entitled to vote, and does vote at the time and place and in
the manner designated by the statute, he ought not to be
deprived of his vote simply because the officers at such election,
by mistake, ignorance, inadvertence, or intentional design,
failed to do their duty.   It seems to me that this principle ought
to be applied to the act under consideration; that a broad and
liberal, instead of a strict, construction should prevail; that the
right of the electors who voted, as I have before stated, intelli-
gently and knowingly, upon the questions submitted to them,
to have their votes considered, should be upheld and main-
tained.

   There is another question that suggests itself to my mind as
proper to be considered, upon the theory that I am in error
and the court right, in the views we have discussed.    The
strongest reason that can be advanced in favor of the construc-
tion given to the statute by the court, is that if the publication
and distribution of the amendments had been made, as pro-
vided in the statute, a greater number of people would have
been advised as to what the amendments were.   If, then, this
statute, in its entirety, was essential for the convenience and
information of the people, still it must be admitted that this
was not the only means by which the necessary information
could be obtained. . The proposed amendments were published
at length prior to the general election, in 1886, in compliance
with the requirements of the constitution, in a newspaper of
general circulation.   They were again published in full in the
statutes of 1887, (165-170.)   The boards of county commissioners

in the several counties issued a proclamation, and caused the same to be published for a period of more than twenty days prior to the general election in 1888, informing the people that these amendments must be voted upon. As a matter of fact, which I have taken the pains to verify, though not legally presented in this proceeding or discussed by counsel, the proclamations of the county commissioners in Storey, Washoe, Elko, Humboldt, Douglas and Nye counties contained a brief synopsis of the change proposed by the several amendments, or a brief reference to the subject of said amendments. Surely the electors had the right to read these publications, or any of them, in order to obtain the necessary information to enable them to vote intelligently upon the propositions submitted to them. The statutes containing the amendments are distributed in every county and can be found in the possession of the county officers, or in the offices of the justices of the peace, and are accessible to every citizen wishing to examine the same. It is fair to presume that the local county papers, in which the proclamation before referred to was published, have, at least, an equal circulation in the home county with any other paper that is published in another county. The votes cast in the counties named, as well as in several of the other counties, as appears by the official returns, show clearly that the electors who voted had knowledge of the questions submitted to them, and understood the manner of voting thereon. If the proposed amendments had been published and distributed as required by the act of 1887, still it is safe to say that a large majority of the electors would have been compelled to seek other information before they could have intelligently voted upon some of the amendments. For instance, take amendment No. 8, as that is the amendment presented to us in this proceeding. If it had been published as required by law, it would have read as follows: " Amendment No. 8. Resolved by the senate, the assembly concurring, that the constitution of the state of Nevada be amended as follows: Amend section 17 of article V of the constitution of the State of Nevada by entirely repealing and striking out the same." Now, in all candor and fairness, is it not true that the elector receiving a copy of the newspaper containing this amendment would have had to look elsewhere in order to know what this

amendment was?   He would have been compelled, even if
the act in question had been in all respects fully complied
with, to look at the constitution itself, or to inquire of his
neighbor or strangers who had examined the constitution, in
order to find out what this amendment was. If, without such
publication, the elector looked at the proclamation of the board
of county commissioners, he would, at a glance, have known
exactly what the amendment was. "No. 8. Abolishing the
office of lieutenant governor. 'Yes or No.'" If the object in-
tended by the legislature in requiring the publication and dis-
tribution of the amendments, in order to impart information to
the people, was accomplished by any other means, ought the
electors of this state to be deprived of their votes simply because
this particular means of knowledge was not placed before them
in the way set forth in the statute? I answer unhesitatingly,
"No." The election law of this state requires the clerks of the
several counties to transmit the returns of the election, as can-
vassed and declared by the county commissioners, to the secre-
tary of state, when not "otherwise directed by the board of
county commissioners," by mail, and makes it a misdemeanor
on the part of the clerk, if they are otherwise sent, to be pun-
ished by a fine "not less than one hundred dollars, or more
than five hundred dollars, and imprisonment in the county jail
for not less than one month, or more than six months, or both
such fine and imprisonment, in the discretion of the court, and
shall be removed from office." (Gen. Stat. 1558.) Now, sup-
pose a clerk should violate this law, and send the returns by
express, or any other unauthorized way, and they arrive safely
at the office of the secretary of state, within the proper
time, duly sealed and correctly endorsed, and there is no
pretense that they were in any manner tampered with;
should not the returns be canvassed and counted in order
to protect the rights of the electors who were not, in any
way, responsible for the wrongful and illegal act of the clerk?
It has been decided in this court, in a case where the provisions
of a statute were deemed essential to impart notice, and had
not been complied with, that, notwithstanding the ruling of the
lower court was erroneous, yet, it appearing that the object of
the notice had been fully accomplished by other means, the
error was not such as to warrant a reversal of the case.
(*Lake* v. *Lake*, 16 Nev. 366.) It is this general, legal and

familiar prinsiple that I here wish to invoke. Its application would not violate any established principle of law or equity. It would not be injurious to the people whose rights are materially affected, abridged, and lost by not considerinj it. If it had been applied, then, to my mind, there ought not to have been a general wreck, crushing all the amendments at one fell blow. Other questions would have to be considered. Although some of the amendments would have fallen by the wayside, because the assembly failed to enter them in their journal, as they were correctly entered in the senate. journal, still the chances are that amendment No. 1, changing the time of meeting of the legislature to the third Monday in January; No, 3, concerning special laws that might be passed by the legislature; No. 23, authorizing the investment of school funds in the bonds of other states; No. 24, to provide a special school tax, not to exceed two mills on the dollar of all taxable property; and, perhaps, some others that also received a majority of all the votes cast in this state—would have run the gauntlet of all other objections and technicalities. For the reasons stated, I am compelled to dissent from the views expressed by the court. I concur in the judgment that the defendant in this proceeding is entitled to his costs, upon the ground that amendment No. 8, which is entered on the assembly journal of 1885, as follows: "Senate concurrent resolution No. 40, relative to the amendment of the constitution of the state of Nevada. Amendment No. 8 shall be repealed and entirely stricken out," (page 232,) —is uncertain and unintelligible, and is not such an entry as is required by the constitution.