[No. 1375.]

THE STATE OF NEVADA ex rel. JAMES D. TORREYSON, ATTORNEY GENERAL, Relator, *v.* O. H. GREY, SECRETARY OF STATE, Respondent.

CONSTITUTIONAL CONSTRUCTION—PUBLICATION OF AMENDMENTS.—Section 1 of article XVI of the constitution of Nevada, requiring proposed amendments to the constitution, which are to be acted on by the next legislature, to be published for three months next preceding the time for electing such legislature, is complied with by the publication of the proposed amendments in the statutes issued and distributed sixteen to eighteen months prior to the election, especially where this mode of publication has been sanctioned by the legislature and followed.

ORIGINAL application for a writ of mandate.

*J. D. Torreyson, in pro. per., Thomas Wren* and *Tremor Coffin,* for Relator.

I. The mode of publishing proposed amendments is vested in the discretion of the legislature. This section of our constitution is taken from that of California, which provided for the publication of proposed amendments in a newspaper. The omission of such provision in our constitution shows that the

mode of publication was left to the legislature.   Our constitu-
tion provides for the publication of the statutes and journals,
and therefore a publication of the proposed amendments in
the statutes and journals is a compliance with the constitution.
(Const. Art. XV, Sec. 8; Const. Art. IV, Sec. 14;  92 Am. Dec.
520, notes and authorities cited;  85 Am. Dec. 360, notes and
authorities cited; Anderson's Law Dic. 843, title, "publication.")
" Whenever the interpretation of a statute or a constitution in
a certain way will result in manifest injustice, courts will always
scrutinize the act or constitution closely to see if it will not
admit of some other interpretation."   (4 Nev. 201; 25 N. E. Rep.
365.)   The publication of the statutes and journals is a contin-
uous publication from the time of their distribution to the pres-
ent time and such publication includes the three months re-
quired by the constitution.

*Sardis Summerfield* and *Robert M. Clarke*, for Respondent.

I.   The publication of proposed amendments contemplated
by the constitution is a publication in some popular channel of
information and for the actual three months next preceding the
election.   The object of such publication was to impart notice
to electors in general of the nature of proposed amendments
to the organic law of the state, and to impart such notice at the
particular time when the electors of the state nominate mem-
bers of the legislature, who will vote for or against the submis-
sion of the amendments to the people according to the choice
of their constituents.

By the Court, MURPHY, C. J.:

At the session of the legislature of 1891 there were intro-
duced and passed by the senate, and concurred in by the
assembly, twenty-six, and introduced and passed by the assem-
bly, and concurred in by the senate, two, making twenty-eight
in all, proposed amendments to the constitution of this state.
Said proposed amendments were agreed to by a majority of all
the members elected to each of the two houses, entered in their
respective journals, with the yeas and nays taken thereon, and
were published in full, with the statutes and the printed pro-
ceedings of the senate and assembly during the year 1891, and
distributed generally throughout the state more than three

months next preceding the general election held in November, 1892. This was the only publication had of such proposed amendments. On the 3d day of February, 1893, the senate and assembly being in session, through their proper officers, requested the secretary of state to return to each of the respective houses the proposed amendments acted upon at the fifteenth session of the legislature, for such further action as may seem to them proper and just, and as provided for in section 1 of article 16 of the constitution. But the secretary of state refused, and still refuses to return said proposed amendments, or any of them, giving as his reason for such refusal that the said proposed amendments were not in a condition to be referred to the present legislature, for the reason that the same had not been published "for three months next preceding the last general election;" he claiming that a publication in the statutes and journals was not a publication "for three months next preceding the general election," and was not such a publication as is required by the constitution. At the request of the senate and assembly, the attorney general applied for and was granted the alternative writ of mandamus.

Section 1 of article 16 reads as follows: "Any amendment or amendments to this constitution may be proposed in the senate or assembly, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their respective journals, with the yeas and nays taken thereon, and referred to the legislature next to be chosen, and shall be published for three months next preceding the time of making such choice. And if in the legislature next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments shall become a part of the constitution." ·

The only question we are required to pass upon is what is meant by the sentence "and shall be published for three months next preceding the time of making such choice?" It is insisted

by the attorneys for the respondent that a publication in the statute does not comply with the requirements of section 1 of article 16 of the constitution, because, the statutes being printed and distributed as expeditiously as possibly after the adjournment of the legislature, and therefore printed and published some eighteen months before the election of members to the next legislature to be chosen; or putting it in another form, the statutes being printed and distributed for more than three months preceding the general election, it was not a publication for three months next preceding the election. It is a well established principle of law, and one that does not require the citation of authorities, " that the greater includes the lesser." Therefore the statutes being printed and published from sixteen to eighteen months before the election, is a publication for three months next preceding the election, for a statute is a continuous publication; it is the publication of edicts which the people in the state are bound to take notice of and act under.

A publication is defined in the dictionaries: " the act of publishing or making known; notifying or printing; proclamation; divulgation; promulgation—as the publication of the gospel; the publication of statutes or edicts. Published is defined by Worcester as the act of publishing or making public; by Webster, the act of publishing or making known; notification to the people at large, either by words, writing, or printing; by Bouvier, as the act by which a thing is made public. The design of publication prescribed by the constitution was to convey to the voters in this state the information that certain constitutional amendments had been proposed, and to afford them an opportunity to discuss the advisability of such proposed amendments, and to govern them in their choice for members of the next legislature; and that object was as well accomplished by a publication in the statutes as it could have been by any other course. It was not only sufficient to satisfy the requirements of the spirit of the constitution, but in our opinion the proceeding in the manner of publication was in conformity with the letter of the section under discussion.

From the reading of the section it is evident that the framers of the constitution intended that the legislature should be the sole judges as to the manner in which such publication is to be made, there being no restraint on them whatever, except requiring the publication to commence at least three months

before the holding of the election; and we cannot, from reason or authority, come to any other conclusion than that a publication for eighteen months must be deemed a publication for three months, so long as that publication continued up to and including the date of the happening of the event for which the publication was intended to give the notice to the voters of the state.

The attorneys for the respondent admit that the legislative department is vested with this discretionary power, in so far as authorizing the method of publication of the amendments, so long as they were published for just three months next preceding the election.   They admit that, by resolution the legislature could authorize publication to be made in one weekly newspaper; or by printing posters at the state printing office and posting them in conspicuous places throughout the state; or by printing circulars and distributing them generally to the voters; and as we understand them, the publication might be made in any conceivable way excepting in the statutes.   This is an attempt to place a construction upon the section never intended by the framers of the instrument, nor the people when they ratified it.   If we were to apply the rule of construction contended for—then if the legislature should introduce a resolution that the notice of the proposed constitutional amendments should be published in one weekly newspaper, and the first issue of such paper containing such notice should be struck off ninety-five days before the election, then it would not be a good publication, because it was published for more than three months next preceding the election—such a "narrow and technical reasoning would be misplaced when brought to bear on an instrument framed and adopted by the people themselves for themselves."   In construing constitutional provisions, courts ought not on the one hand to indulge in ingenious speculations which may lead us wide from the sense and spirit of the instrument; nor should we apply to it such a narrow construction as would exclude the main object and intention of its framers.   Therefore, where the words of a constitution are unambiguous and in their commonly received sense lead to a reasonable conclusion, then such instrument should be read according to the natural and most obvious import of its framers, without resorting to subtle and forced construction for the purpose of limiting or extending its operations.

The section under consideration contemplates a publication

in the statutes or in the newspapers, as the legislature may determine, and that department has in one instance given to section 1 of article 16 of the constitution a construction which we think we are in duty bound to adopt.   That was during the twelfth session.   Stat. 1885, p. 150, " Senate joint and concurrent resolutions relative to the manner in which resolutions proposing constitutional amendments shall be treated."   The fifth subdivision of that resolution reads:  " Fifth.   That said duplicate enrolled copies of said resolutions shall be published in the printed copies of the statutes and resolutions of the present session of the legislature in the same order and manner as if they were the original enrolled resolutions."   Showing conclusively that it was their understanding from the reading of the section under discussion that a publication in the statutes was all that was required under its provisions, and in this we think that they gave to the section the construction that was intended to be placed upon it by the framers of that instrument. From an examination of constitutions, in relation to proposed amendments of other states, we find that in quite a number no publication is required.   In others publication is made in the statutes; and in others publication is required from three to twelve months, and the manner of publication is provided for in the constitutions or by a general law.

Section 8 of article 15 of the constitution provides:  " That the legislature shall provide for the speedy publication of all statute laws of a general nature."   On the 14th day of February, 1865, the legislature did enact a law, which law is still in force, requiring the printing, free distribution and sale of all laws, resolutions and memorials passed at each session of the legislature.   That course having been pursued for such a length of time by the legislature, and acquiesced in by the people, it is fair to presume that they deemed the publication in the statutes a compliance with the constitutional requirements.   For " frequent exercises of power uniform and long acquiescence of the people in it, constitute a fundamental law, as binding as though it had been formulated expressly in the constitution."   (James. Const. Con. 574h; Cooley, Const. Lim. 82; Sedg. St. Const., 412.)   Our constitution having been adopted in the month of October, 1864, and numerous  mendments having been proposed and acted upon by the people, and some of them having been ratified, they are now a part of the constitution, under

which laws have been enacted and property rights acquired.
The executive department of the state government has in many
ways recognized them, and this court having sustained the con-
stitutionality of laws enacted to carry into effect the provisions
of the amendments so proposed and ratified by the people, pub-
lication in the statutes having the sanction of long and general
approval, were there ever a doubt existing as to the legality of
the publication, the people having acted under the construc-
tion placed upon the section by the legislature, under such cir-
cumstances it is our duty to hold that a publication in the
statutes is a compliance with section 1 of article 16 of the con-
stitution, and the proposed amendments should be referred to
the present session of the legislature for such further action as
to them may seem just. It is therefore ordered that the per-
emptory writ of *mandamus* issue forthwith.

BIGELOW, J., concuring:

This case turns upon a determination of the question whether
the constitutional amendments proposed by the legislature of
1891 have been published in accordance with the requirements
of section 1 of article 16 of the constitution of this state. No
other point has been discussed or presented, and in view of the
great importance of this matter we propose to consider it with-
out raising any other question ourselves.

These amendments were proposed as joint resolutions of the
two houses at the fifteenth session, and it is admitted were reg-
ularly entered upon the legislative journals, with the yeas and
nays of those voting upon them, were properly referred to the
succeeding legislature, and were published according to law in
the printed journals and statutes of that session; but there has
been no official publication in any other manner, and it is
claimed that this publication is insufficient, under the constitu-
tion.

Section 1 of article 16 reads as follows: " Any amendment or
amendments to this constitution may be proposed in the senate
or assembly, and if the same shall be agreed to by a majority of
all the members elected to each of the two houses, such pro-
posed amendment or amendments shall be entered on their
respective journals, with the yeas and nays taken thereon, and
referred to the legislature then next to be chosen, and shall be
published for three months next preceding the time of making

such choice. And if in the legislature next chosen as aforesaid such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments shall become a part of the constitution."

It must be admitted that this provision concerning publication is not self-executing, except, perhaps, in the sense that anything done contrary to its provisions would be null and void; but it does not place the duty of making the publication upon any officer or board, nor does it prescribe what shall constitute the publication required. To this extent, at least, it must have been intended that the legislature proposing the amendments should exercise its discretion. If it be conceded that the provision means some kind of a publication extending through the three months preceding the election, as is contended by respondent's counsel, it does not follow that it must be made in a newspaper. A regular publication and distribution of the amendments during that time, either daily, weekly, or monthly, by the state printing office or other instrumentality, would comply with its language, and doubtless result in as wide a dissemination among the people of knowledge concerning the amendments as would their publication in any one newspaper. If we concede that the clause requires a publication in a newspaper, it is still for the legislature to say how often it must be published, and whether in one newspaper in the state, or one in each county, or more or less than those numbers. So, in any view, within lines more or less circumscribed, it is a matter for the legislature to deal with. I think it must also be admitted that the construction to be placed upon this language is to some extent a matter of doubt. Whether the publication in the journals and statutes is a compliance with its requirements is a question concerning which men may reasonably differ. This is shown by the fact that since the adoption of the constitution sixty-four amendments have been proposed by nine different legislatures, and no provision has ever been made for any other publication than this.

Some courts have held that similar language was satisfied by one publication made the necessary time before the event, and that such publication constituted a continuous publication for the required time. (*Mayor, etc.,* v. *Gear,* 27 N. J. Law 265; opinion of Beck, J., in *Koehler* v. *Hill,* 60 Iowa 579.)

Heretofore in this state there has been no question made, either in the courts or before the people, that the publication in the journals and statutes was not sufficient; many able attorneys are now of the opinion that such publication is in strict accordance with the constitution, and that is the judgment of my honorable associate upon the bench, Chief Justice Murphy. Under these circumstances, it is safe to say that if such publication is not sufficient, there has been at least reasonable grounds for believing that it was. Such being the case, although if the question were now *res integra,* I should perhaps come to a different conclusion, I feel constrained to follow the practical construction that has been so long placed upon this clause. Since the adoption of the constitution, commencing within ten years thereafter, some sixty-four amendments have been proposed by the different legislatures. A large number of these have been agreed to by the succeeding legislatures, and submitted to the people; they have acted upon them, and some having received a majority of all the votes cast, have been incorporated into the fundamental law, and been recognized as a part of the constitution by the people, the legislatures and the courts. The legislature of 1877 proposed what is now known as section 10 of article 11, prohibiting the use of public funds for sectarian purposes. It was agreed to by the legislature of 1879, and adopted by the people at the election of 1880.

In 1881 (Stat. 1881, p. 122) the legislature directed the payment by the state to the several orphan asylums therein of the sum of seventy-five dollars per annum for each orphan. Under this act the Nevada orphan asylum presented a claim for a sum of money, but the controller refused to draw a warrant for it, upon the ground that the act was in conflict with the section of the constitution just mentioned. In the case of *State ex rel. Nevada Orphan Asylum* v. *Hallock,* 16 Nev. 373, this contention was sustained, and the law declared unconstitutional by this court. The orphan asylum was there represented by as able counsel as were to be found in the state, including two who had ornamented the supreme bench, but no suggestion

was made either by them or the court that the amendment had
not been constitutionally adopted.    Seven other amendments
have also been made in the same manner, which are now recog-
nized as being a part of the state constitution, and have been
treated as such for years past by the legislature, the courts and
the people.    No argument has been made that the amend-
ments could be valid if not published as required by the con-
stitution, and doubtless under the decisions, particularly of
this court (*State* v. *Tufly,* 19 Nev. 391; *State* v. *Davis,* 20 Nev.
221), they would not be.    I know of no principle upon which
those amendments can be held to be a part of our constitution
if the publication now under consideration is held insufficient.

All of these acts constitute such a practical construction of a
doubtful clause of the constitution as should now, in my judg-
ment, conclude the court from placing any other upon it.    This
principle is laid down by all the text writers and has often
been recognized and adopted by the courts.    Judge Cooley
states it thus:    "But where there has been a practical construc-
tion which has been acquiesced in for a considerable period,
considerations in favor of adhering to this construction some-
times present themselves to the courts with a plausibility and
force which it is not easy to resist.    Indeed, where a particular
construction has been generally accepted as correct, and espe-
cially when this has occurred contemporaneously with the adop-
tion of the constitution, and by those who had opportunity to
understand the intention of the instrument, it is not to be
denied that a strong presumption exists that the construction
rightly interprets the intention.    And where this has been given
by officers in the discharge of their official duty, and rights
have accrued in reliance upon it, which would be divested by a
decision that the construction was erroneous, the argument *ab
inconvenienti* is sometimes allowed to have very great weight."
(Cooley, Const. Lim. 82.)

In Endlich's Interp. Stat. Sec. 527, it is said:    "The greatest
deference is shown by the courts to the interpretation put upon
the constitution by the legislature in the enactment of laws and
other practical application of constitutional provision to the
legislative business, when that interpretation has had the silent
acquiescence of the people, including the legal profession and
the judiciary, and especially when injurious results would fol-
low the disturbing of it."    Sutherland says:    "A construction

of a constitution, if nearly contemporaneous with its adoption, and followed and acquiesced in for a long period of years afterwards, is never to be lightly disregarded, and is often conclusive." (Stat. Const. Sec. 307.) "The uniform legislative interpretation of doubtful constitutional provisions, running through many years, and a similar construction of statutes, has great weight.' (Id. Sec. 311.) To the same effect are Sedgwick, Stat. Const. 412, and Story, Const. Secs. 404, 1093.

In *Bingham* v. *Miller*, 17 Ohio, 445, the authority of the legislature to grant divorces came before the supreme court, and although the court was unhesitatingly of the opinion that the legislature had no constitutional right to grant them, yet the early assumption and long continued exercise by that body of the power to do so was held to have established their validity. A similar ruling was made in *Cronise* v. *Cronise*, 54 Pa. St. 260, where the court, speaking by Agnew, J., said: "I repeat a common thought when I say that a constitution is not to be interpreted as a private writing by rules of art which the law gives to ascertain its meaning, but is to be studied in the light of ordinary language, the circumstances attending its formation, and the construction placed upon it by the people whose bond it is. Judged by these tests, special divorce laws are legislative acts. * * * *Communis error facit jus* would be sufficient to support it, but it stands upon the higher ground of contemporaneous and continued construction by the people of their own instrument." So in *Mining Co.* v. *Seawell*, 11 Nev. 399, Hawley, C. J., delivering the opinion, said: "But in this connection it must, as we think, be admitted that although the action of the legislature is not final, its decision upon this point is to be treated by the courts with the consideration which is due to a co-ordinate department of the state government, and in case of a reasonable doubt as to the meaning of the words, the construction given to them by the legislature ought to prevail." The supreme court of Illinois, in considering the construction to be placed upon a constitutional provision, used this language: "Again this question is purely political. No private rights are involved. It is a rule of law, well established, that where questions involved are purely political, and depend upon the construction to be given to provisions of doubtful interpretation, the court will not only give great consideration to a construction given by the political de-

partments of the state, but will generally follow such construction implicitly." (*People* v. *La Salle Co.*, 100 Ill. 495.) The supreme court of the United States has given the principle the weighty sanction of their authority, by declaring that a contemporary exposition of the constitution, practiced and acquiesced in for only about twelve years, fixes its construction (*Stuart* v. *Laird*, 1 Cranch 299); and in pronouncing the practical construction of a statute to be the one that must be enforced, although clearly not authorized by the terms of the law itself. (*McKeen* v. *Delancy's Lessee*, 5 Cranch 22.)

It would be unprofitable to make further extracts from the decisions; suffice it to say that the cases wherein the doctrine has been recognized and applied are both numerous and well considered. (*Mayor* v. *Board*, 15 Md. 458; *Scanlan* v. *Childs*, 33 Wis. 666; *Johnson* v. *Railroad Co.*, 23 Ill. 202; *Harrington* v. *Smith*, 28 Wis. 43; *Packard* v. *Richardson*, 17 Mass. 144; *Rogers* v. *Goodwin*, 2 Mass. 477; *Moers* v. *Reading*, 21 Pa. St. 188; *State Line, etc., R. Co.'s Appeal*, 77 Pa. St. 429; *Holmes* v. *Hunt*, 122 Mass. 505, 516; Opinion of the Judges, 126 Mass. 594.)

Perhaps a word should be added in explanation of the language used in the opinion in *State* v. *Davis*, 20 Nev. 220, to the effect that the amendments then under consideration had been published in a newspaper according to the requirements of the constitution. The point was not involved in that case. The record shows neither pleading nor proof concerning it, nor was it referred to in the briefs of counsel. The judges must have obtained the knowledge asserted by them extraneously. Inquiry at the bar, upon the argument here, developed the fact that while those amendments were pending they were published by a proprietor of a newspaper in Carson, who was of the opinion that they should be so published; but this was done without the sanction of any law, or the direction or order of any board or officer. This is probably what was referred to, but such an unauthorized publication could, of course, have no validity (*Clark* v. *Janesville*, 10 Wis. 136, 181), and amounted to no more than the publication that is always made by the newspapers of the state, as a matter of interest to their readers. This, consequently, is no variation of the constant practice to publish only in the journals and statutes, of which I have spoken.

While the principle of following a contemporaneous and practical construction of a statute or constitution should never be applied except in cases of reasonable doubt, and perhaps not where it is calculated to work wrong or injury to any class or interest, yet within these lines where it has been so uniformly followed, as has been the case here, and a different construction would be fraught with such serious consequences, it should be held to have fixed the meaning of the language, although without this it might be held to mean something different. For this reason I concur in the order directing the writ to issue.