[No. 12995. *En Banc.* December 10, 1915.]

## J. L. GOTTSTEIN et al., *Appellants*, v. ERNEST LISTER, *Governor, et al., Respondents.*[1]

CONSTITUTIONAL LAW—AMENDMENTS—ENACTMENT — JOURNAL EN-TRIES. Const., art. 23, § 1, providing that proposed constitutional amendments shall be entered upon the journals of the house and senate, is satisfied by entries on the journal referring to the proposed amendment in the language of the title to the proposing act, where the title was sufficient as such, without copying in the journals the proposed amendment in full.

SAME—AMENDMENT—SUBMISSION—ONE OR SEPARATE AMENDMENTS. The initiative and referendum (seventh) amendment to the constitution (Laws 1911, p. 136), amending Const., art. 2, § 1 (which vested the legislative power in a senate and house of representatives), so as to provide for the exercise of legislative power (1) by the initiation of measures directly by the people, and (2) by the referendum of acts passed by the legislature, and also (3) withholding the veto power of the governor from measures initiated by or referred to the people, constitutes but one amendment, within Const., art. 23, § 1, providing that, if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against each amendment separately.

SAME—AMENDMENTS—SEPARATE SUBJECTS—LEGISLATIVE POWERS—"VETO." The veto power of the governor is a legislative and not an executive power, and an amendment of the constitutional provisions vesting the legislative powers in a senate and house of representatives may properly include a clause restricting the veto power.

CONSTITUTIONAL LAW—AMENDMENTS—VALIDITY — REQUISITES—NO-TICE—POWER OF COURTS. While the courts have power, and it is their duty, to declare void any attempted amendment to the constitution which is not attended with the prerequisite notice required by the constitution, they cannot do so unless they can judicially know that there has been such want of the constitutional requisite.

SAME—AMENDMENTS—VALIDITY—REQUISITE NOTICE—PROOF—POW-ER OF COURTS TO DETERMINE—JUDICIAL NOTICE—STIPULATIONS. In determining whether a constitutional amendment was submitted with the prerequisite notice required by the constitution, the courts can consider only facts which the court is bound to judicially notice as absolutely true or not true; hence a stipulation of counsel as to

[1]Reported in 153 Pac. 595.

what the facts are has no controlling force and cannot be considered.

SAME—AMENDMENTS—VALIDITY—REQUISITE NOTICE—PROOF—FACTS JUDICIALLY NOTICED—PRESUMPTIONS. With respect to the adoption of the initiative and referendum amendment to the constitution (Laws 1911, p. 136), the officially recorded facts of which the court takes judicial notice are that the legislature of 1911 passed an act proposing it, that the act was evidenced by proper entries on the journals, that the legislature provided for its publication prior to election as required by Const., art. 23, that there were cast for the adoption 110,110 votes, and against its adoption 43,905 votes, and that, on a canvass of the election returns, the governor issued his proclamation December 28, 1912, declaring the amendment adopted, as required by the constitution; and there being no other officially recorded fact, and no fact of such notoriety as to bring it within the realm of judicial notice, the courts must conclusively presume that the publication was made in obedience to the requirements of the constitution.

SAME. Under the rule of general notoriety, as defining the limits of judicial notice, a court cannot judicially notice facts touching the publication of a constitutional amendment, required by law prior to the election for its adoption, where neither the constitution nor the statute made provision for preserving some official record touching the fact.

SAME. The fact that the provisions of the constitution respecting the prerequisites for the adoption of an amendment are mandatory does not put upon the court the sole duty and burden of seeing that the requirements are enforced, where the court is unable to lawfully draw to itself such knowledge of the facts as will enable it to judicially know whether or not the mandate of the constitution has been complied with.

SAME—AMENDMENTS—VALIDITY—REQUISITE NOTICE—PROOF—FACTS JUDICIALLY NOTICED—PRESUMPTIONS. With respect to the adoption of the prohibition amendment to the constitution relating to intoxicating liquors, the officially recorded facts of which the court takes judicial notice are that it was submitted to and voted upon by the people at the general election of November, 1914; that 381,643 electors voted at such election, casting for its adoption 189,840 votes, and against its adoption 171,208 votes, 361,048 electors thereby voting upon the measure; that, upon a canvass of the returns of the election showing the result, the governor, in accordance with the provisions of the act of 1913, issued his proclamation December 5th, 1914, proclaiming such result; and there being no other facts required by the constitution or the statute to be officially recorded, and no fact of such general notoriety as to bring it within the realm

of judicial knowledge, it must be conclusively presumed that publication of the measure was made as the constitution and statute required.

EVIDENCE—JUDICIAL NOTICE—POPULATION. The court will take judicial notice as a matter of common knowledge, that there are not 900,000 electors in the state of Washington.

CONSTITUTIONAL LAW — AMENDMENTS — ENACTMENT — NUMBER OF "VOTES CAST"—STATUTES—CONSTRUCTION. Under the seventh amendment to the constitution, providing that any measure initiated by or referred to the people shall take effect and become a law if approved by a majority of the votes cast thereon, the words "votes cast" means the same as "number of voters voting at such election."

STATUTES — CONSTITUTIONALITY — PARTIAL INVALIDITY — EFFECT. Under the prohibition initiative measure, Laws of 1915, p. 15, § 26, providing that if any provision or section of the act shall be held void or unconstitutional, all other parts shall continue in full force and effect, the constitutionality of other parts of the act is not affected by the unconstitutionality of § 33, providing that the act shall take effect and be in full force from and after the 1st day of January, 1916, in violation of the seventh amendment to the constitution, providing that initiative measures shall be in operation on and after the thirtieth day after the election at which they are approved.

CONSTITUTIONAL LAW — INTOXICATING LIQUORS — PRIVILEGES AND IMMUNITIES—EQUAL PROTECTION OF THE LAWS. The prohibition initiative measure (Laws 1915, p. 2) relating to intoxicating liquors does not violate the equal privileges and equal protection of the laws guaranties of the state and Federal constitutions in that it permits registered druggists and pharmacists to sell intoxicating liquors under certain conditions.

COMMERCE—INTERSTATE COMMERCE—INTOXICATING LIQUORS—STATE REGULATION. The prohibition initiative measure (Laws 1915, p. 2) relating to intoxicating liquors, in so far as it regulates shipments into the state, is not an unlawful interference with interstate commerce; since, by the Webb-Kenyon act, 37 U. S. Stat. at L., p. 699, ch. 90, Congress, in declaring unlawful the shipment of intoxicating liquors into a state to be received, possessed, sold or used in violation of any law of such state, has divested intoxicating liquors of their interstate character in so far as the power of the state to regulate the sale and disposition is concerned.

SAME—INTERSTATE COMMERCE—INTOXICATING LIQUORS—STATE REGULATION—VALIDITY. The Webb-Kenyon act, making it unlawful to ship intoxicating liquors into a state to be received, possessed, sold or used in violation of any law of such state, is not unconstitutional as conferring upon state legislatures the power to regulate inter-

state commerce; since Congress has power to exclude from interstate commerce intoxicating liquors or other deleterious substances.

INJUNCTION—AGAINST ENFORCEMENT OF LAW—PARTIES ENTITLED— PROPERTY RIGHTS.  Where property rights are not involved, a citizen may not obtain relief by injunction against the enforcement of the provisions of the prohibition initiative measure relating to intoxicating liquors.

Appeal from a judgment of the superior court for Thurston county, D. F. Wright, J., entered July 29, 1915, in favor of the defendants, dismissing an action to enjoin the enforcement of an initiative measure prohibiting the manufacture, keeping, sale and disposition of intoxicating liquors, tried to the court upon the pleadings and an agreed statement of facts.   Affirmed.

*Preston & Thorgrimson* and *Donworth & Todd,* for appellants.

*The Attorney General* and *John H. Powell* and *L. L. Thompson,* for respondents.

*Dudley G. Wooten* and *T. D. Rockwell,* for interveners.

*Piles, Howe & Carey, amici curiae.*

PARKER, J.—The plaintiffs, J. L. Gottstein *et al.,* and the interveners, Griffin & Mork *et al.,* seek to have the state and county officials enjoined from enforcing the provisions of initiative measure No. 3, prohibiting the manufacture, keeping, sale and disposition of intoxicating liquors, except in certain cases, approved by vote of the people at the general election of November 3, 1914.   The cause was submitted to the superior court upon the pleadings and a statement of facts agreed upon by counsel for the respective parties.  After hearing argument of counsel upon the record so made, the superior court rendered judgment in favor of the defendants, dismissing the complaints of the plaintiffs and interveners, from which they have appealed to this court.

The contentions made in the superior court by counsel for appellants, as they are also made here, are, in substance:

(1) That the seventh amendment to our state constitution, providing for the initiative and referendum, was not legally submitted to and adopted by the people, and is, therefore, not a valid part of the constitution so as to furnish any authority for the adoption of initiative measure No. 3 by vote of the people; (2) that, if the seventh amendment to the constitution be a valid part thereof, initiative measure No. 3 was not legally submitted to and adopted by the people so as to become an existing law, aside from the constitutionality of its provisions; and (3) that initiative measure No. 3 is unconstitutional and void, especially in that it violates the equal privileges and immunities, and equal protection of the laws, guaranties of the state and Federal constitutions, and also in that it interferes with interstate commerce.

Appellants, Gottstein *et al.*, are now, and for many years past have been, lawfully engaged in the wholesale liquor business in Seattle, and have a large stock of goods on hand and a large amount of capital invested in their business. If enforced, the provisions of initiative measure No. 3 will compel the discontinuance of their business in this state and result in large financial loss to them. They prosecute this action in behalf of themselves and all others similarly situated who may desire to join as plaintiffs therein. Appellants, Griffin & Mork *et al.*, are severally the owners of, and engaged in operating, hotels in several of the cities of this state, being members of a voluntary organization known as the "Washington State Hotel Association." They come into the cause by complaint in intervention in which they all join as plaintiffs, alleging facts relative to their business, their investments therein, their lawfully dealing in intoxicating liquors as a part thereof, and the compelling of the discontinuance of that portion of their business, resulting in their large financial loss if the provisions of initiative measure No. 3 be enforced, substantially as alleged by the original plaintiffs and appellants, J. L. Gottstein *et al.* No contention is made by counsel for respondents that the existing business

and property interests of appellants here involved and the threatened financial loss to them by the enforcement of initiative measure No. 3 is not such as entitles them to the relief prayed for in this form of action, if their contentions touching the merits of the controversy be well founded.

The contention of counsel for appellants first in natural order is that the proposal by the legislature of the seventh amendment to the constitution, providing for the initiative and referendum, was not lawfully evidenced by proper entries on the journals of the senate and house of representatives, as provided by article 23 of the constitution relating to amendments thereto. This contention, we think, requires but little notice here, since the entries made on the senate and house journals of the proposal of this amendment were substantially the same as those made in the proposal of the eighth amendment to the constitution providing for the recall, which was held by us in *Cudihee v. Phelps*, 76 Wash. 314, 136 Pac. 367, to comply with the requirements of article 23 of the constitution. The question was reviewed at length in that decision, and we adhere to the conclusion there reached that entries made on the journals, referring to a proposed amendment in the language of the title to the proposing act, the title being sufficient as such, satisfies the requirements of article 23 of the constitution, without copying in the journals such proposed amendment in full. We conclude that the seventh amendment did not fail of lawful adoption for want of proper entries on the senate and house journals.

Did the seventh amendment to the constitution fail of legal adoption because of its proposal and submission to the people as one amendment? It is so contended by counsel for appellants. Section 1, article 23, of the constitution reads in part as follows:

"Any amendment or amendments to this constitution may be proposed . . . Provided, that if more than one amendment be submitted, they shall be submitted in such manner

that the people may vote for or against such amendments separately. . . ."

The seventh amendment purports to amend directly only section 1 of article 2 of the constitution, the whole of which, prior to the amendment, read as follows:

"The legislative powers shall be vested in a senate and house of representatives, which shall be called the legislature of the state of Washington."

This language is repeated in substance in the seventh amendment, and is qualified by additional provisions therein providing for the exercise of legislative power directly by the people through the initiative and referendum, which amendment also withholds the veto power of the governor from "measures initiated by or referred to the people." Laws of 1911, p. 136. These, it is insisted, are three, or at least, two subjects, so separable each from the other that they constitute, in substance, as many different amendments, and hence must "be submitted in such manner that the people may vote for or against such amendments separately," to the end that the provisions of article 23 of the constitution be not violated. Section 3 of the act proposing the amendment provides for the submission thereof to the people as a single amendment. Laws of 1911, p. 140.

There is then presented in this branch of the case the question, Did this proposal of the legislature involve more than one amendment within the meaning of the provision of article 23 of the constitution above quoted? The argument of counsel for appellants proceeds largely upon the theory that the initiative and referendum are separate subjects and look to the attainment of separate objects, and the fact that an elector might consistently favor one and oppose the other is controlling as to their separateness of subject-matter and purpose. Now, since the constitution does not in terms prescribe what shall be regarded as one amendment for the purpose of enabling the electors to vote thereon separately, the

question is manifestly to be answered by a consideration of
the inherent nature of any given proposed amendment. The
logic of counsel's contentions would seem to lead to such a
minute subdivision of matters liable to become the subject of
constitutional amendment as to practically refine out of ex-
istence the power of the people to amend the constitution.
Almost any conceivable amendment to the constitution is ca-
pable of being subdivided into separate propositions of such
nature that an elector might consistently favor the adoption
of some and the rejection of others. As we proceed we think
it will be found that the singleness of a given proposition be-
yond division is not the ultimate test; but that the question
must be viewed in a broader aspect as one largely of common
sense, and in a spirit of deference to the discretion of the
legislature, much as we defer to legislative discretion in re-
stricting a bill to one subject and expressing such subject
in the title thereof, as required by section 19, article 2 of
the constitution, though possibly the latitude of the legis-
lature is hardly so broad in determining what constitutes one
amendment to the constitution.

The question of what constitutes one amendment within the
meaning of a constitutional provision like ours, of which
there are many in the Union, seems to have been first con-
sidered by the supreme court of Wisconsin in 1882 in *State
ex rel. Hudd v. Timme*, 54 Wis. 318, 11 N. W. 785. There
was drawn in question in that case a constitutional amend-
ment the provisions of which are summarized by the court
on page 326 as follows:

"It *first* provides that members of the assembly shall be
chosen biennially by single districts, on the Tuesday succeed-
ing the first Monday of November after the adoption of this
amendment; *secondly,* that the senators are to be chosen at
the same time and in the same manner as the members of the
assembly, except that they shall be chosen alternately in the
odd and even numbered districts, and that all senators elected
after the adoption of the amendment shall hold their offices
for four years, and that the senators elected or holding over

at the time of the adoption of the amendment shall continue in office' till their successors are duly elected and qualified; *thirdly*, that the legislature shall meet at the seat of government, at such time *as shall be provided by law*, once in two years, and no oftener, etc.; and *fourthly*, that their compensation, by way of salary, shall be $500;"

This, it was insisted, constituted at least four amendments and should have been submitted as four separate propositions, in order to comply with the constitutional requirement that "if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately." Answering this contention, Justice Taylor, speaking for the court, said:

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. Tested by this rule, the propositions submitted to the electors contained but one amendment. It is clear that the whole scope and purpose of the matter submitted to the electors for their ratification was the change from annual to biennial sessions of the legislature. . . . The question of compensation was, perhaps, less intimately and necessarily connected with the change to biennial sessions, yet it was clearly connected with it. The duties and service having been somewhat enlarged, it was proper that the compensation should be increased. We do not contend that the legislature, if it had seen fit, might not have adopted these changes as separate amendments, and have submitted them to the people as such; but we think, under the constitution, the legislature has a discretion, within the limits above suggested, of determining what shall be submitted as a single amendment, and they are not compelled to submit as separate amendments the separate propositions necessary to accomplish a single purpose."

In *State ex rel. Morris v. Mason*, 43 La. Ann. 590, 9 South. 776, there was drawn in question a constitutional

amendment relating to lotteries and the distribution of revenues derived therefrom in fixed proportions, to the public schools, to levees, to charities, to pensions, to sanitary purposes, and to the general fund of the state. Contention was made against the amendment the same, in substance, as is here made, the constitutional provision invoked being, in substance, the same. The amendment was held to have been constitutionally submitted as one proposition, in that it related to one general subject, to wit, lotteries. The court reached its conclusion evidently upon the authority of the Wisconsin case above noticed, quoting in part with approval from that portion of the decision above quoted by us.

In *State ex rel. Adams v. Herried,* 10 S. D. 109, 72 N. W. 93, the question was presented by the challenging of a constitutional amendment which provided for a change in the administration of the several educational institutions of the state, concentrating their administration into a central board from that of local boards. The constitutional provision involved was in the exact words of our own. Answering the contention that there was, in substance, more than one amendment and that the submission to the people should have been as separate propositions, Judge Haney, speaking for the court, said:

"A glance at the official ballot shows that each elector was compelled to vote for or against all of the proposed changes. If any effect be given to the title of the joint resolution, it would seem to indicate that the legislature regarded it as embracing more than one amendment, and the inference arises that those who prepared the ballots failed to carry out the legislative intent. But conceding this to be so, if, as a matter of law, but one amendment is included in the resolution, the error of those who prepared the ballots should not be permitted to defeat the proposed change. Then the question is presented: Does the resolution contain more than one amendment, within the meaning of the constitution? It is contended with much apparent reason that two distinct objects were intended, namely, the abolition of the trustees, and a change in the number and powers of the regents; that

these objects are independent of each other; that either might have been adopted without adopting the other; and that there are numerous reasons why an elector might have desired one change, and not the other. The defect in this argument consists in substituting for the real object or purpose one of its incidents. Control of the state educational institutions is the subject to which the proposed amendment relates. Its purpose or object is to place such institutions under the control of a single board. The membership of such board, its powers, and the abolition of local boards, are but incidental to and necessarily connected with the object intended. Hence we conclude that only one amendment was submitted. It must be conceded that courts and lawyers may easily differ regarding the result reached herein. The question is involved in serious doubt. Such being the situation, the court invokes the well-recognized rule, applicable here, as in cases where the constitutionality of statutes is brought in question, and sustains the amendment, because it does not plainly and palpably appear to be invalid."

The question was similarly presented to the supreme court of Georgia in *Hammond v. Clark*, 136 Ga. 313, 324, 71 S. E. 479, 38 L. R. A. (N. S.) 77, wherein it was disposed of by Justice Lumpkin, speaking for the court, in part as follows:

"It was contended that the proposed amendment which was submitted to the people for ratification contained several distinct propositions, and that each of these constituted in effect a separate amendment, and should have been separately submitted. The constitution provides, that, 'When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately.' This amendment was to a single paragraph of the constitution. While the amendment included more propositions than one, they were not wholly distinct and separate, or in regard to different subject-matters, but all tended to carry out one general purpose, and dealt with a single subject-matter—the salaries of judges in certain judicial circuits. It is true that it dealt with those salaries both in the past and in the future, but that is not a sufficient basis for a court to hold that it was necessary for the legislature to have proposed two distinct amendments on

that subject, instead of one. It was argued that some of the voters might have been willing to increase the salary for the future, but not to ratify its payment in the past (this court having held that the legislative provision for payment of the increase of salaries from the county treasuries was unconstitutional), and that the two things should have been separated. Had the legislature seen fit to divide the two propositions in regard to the salaries of such judges, and to have submitted them separately, we do not say that they might not have done so. But we can not hold that they were obliged to do so. Almost every amendment to the constitution or to a legislative act involves more than a single simple proposition."

In *Jones v. McClaughry* (Iowa), 151 N. W. 210, there was drawn in question a constitutional amendment providing for the organization of grand juries, and also providing that the general assembly might provide for holding persons to answer any criminal offense without the aid of a grand jury. Answering the contention that this was the submission of two amendments as one, Justice Ladd, speaking for the court, said:

"The particular criticism of the amendment is that it is in reality two amendments, even though designated as one, and therefore its submission as one was in violation of section 2 of article 10 of the constitution directing that: 'If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately.'

"The importance of this provision was referred to in *Lobaugh v. Cook*, 127 Ia. 181, 102 N. W. 1121. Its purpose is to exact the submission of each amendment upon its merits alone, and thereby secure the free and independent expression of the will of the people thereon. Incongruous matter and that having no connection with the main subject is excluded, and the evil of loading a meritorious proposition with another of doubtful propriety obviated. The elector in approving or rejecting cannot be put in a position where he may be compelled, in order to aid in carrying a proposition, also to vote for another which, if separately submitted, he would reject. But this does not mean that every proposed

change shall necessarily be analyzed into its minutest component parts, and these separately submitted. All intended is that but one subject be dealt with in a single amendment. 'If,' as said in *Lobaugh v. Cook*, 'the amendment has but one object and purpose, and all else included therein is incidental thereto, and reasonably necessary to effect the object and purpose contemplated, it is not inimical to the charge of containing more than one amendment.' "

In *State ex rel. Hay v. Alderson*, 49 Mont. 387, 142 Pac. 210, we have a case exactly in point. The constitutional amendment there involved is, in substance, the same as that now before us, providing for the initiative and referendum. The provisions of the Montana constitution touching the submission of amendments thereto separately, reads:

"Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished by numbers or otherwise that each can be voted upon separately." Montana Const., art. 19, § 9.

In holding that the amendment providing for the initiative and referendum is one amendment within the meaning of this constitutional provision, the court observed:

"Only one provision of the constitution was changed, to-wit, the provision by which the entire legislative authority of the state had been lodged in the legislative assembly. This fact is not of great importance, but it is important that but one change was made, viz.: To express a reservation of legislative authority in the people. That such authority could be used in two ways—designated, respectively, as the power to propose and enact laws, and the power to approve or reject laws enacted by the legislative assembly—does not suggest disconnection, but enumeration of the parts of a whole. Nor is the fact that a greater proportion of the electorate is required for the initiative than for the referendum necessarily significant of more than that one mode of using the reserved authority is deemed of greater value than the other. These provisions are purely detail, which might, without injury to the amendment, have been left for the legislative assembly to establish. So, too, the referendum, while in political effect a veto, is not such in the sense in which that

term is used in our constitution, and is not an invasion of the executive function. Under it the people proceed toward bills enacted by the assembly, expressing assent or dissent, in essentially the same manner as the senate upon a bill which has passed the house; they are an additional body through which acts of the legislature must pass in certain cases, and disapproval, when it occurs, is purely legislative.

"It is undoubtedly true that, as the amendment was submitted, persons who approved the initiative, and not the referendum, or *vice versa,* were obliged to take both or neither. But this circumstance is not fatal if they were both parts of a single plan or general purpose; such divergencies of opinion are conceivable as to any amendment involving particularization. 'The unity of object is to be looked for in the ultimate end, and not in the detail or steps leading to the end.' . . .

"After all is said, then, the question is an historical one. Much is made of the fact that the initiative is wholly foreign to our institutions, whereas the referendum has been with us, in one form or another, since early ages; but the referendum established by the amendment in question is the Swiss referendum, and is not the plebiscite resorted to in American practice from the earliest times for the settlement of constitutional or local questions; and while it is a fact that the initiative is the later invention, and does not prevail in all the communities which have the referendum, a very brief glance into political history will disclose that the initiative and referendum came to us together and at a time when they were considered as essentially complementary. It will readily be recalled that for at least fifteen years prior to 1906 distrust of legislatures as truly representative of popular will was widespread, and there was vigorous agitation for a corrective. The press teemed with discussions of the initiative and referendum, always bracketed together, as a supposed panacea; many states adopted them as one, and there cannot be the slightest doubt that to the common understanding of our people they presented the aspect of a single plan to control the power of the legislature through the means of 'direct legislation.' (See Oberheltzer on Referendum, Chap. 15; Phelps on Initiative and Referendum.) By them, as the supreme court of California has said, the people reserved to themselves supervisory control of legislation (*In re Pfahler,* 150 Cal. 71, 76, 77, 11 Ann. Cas. 911, 11 L. R. A. (N. S.)

1092, 88 Pac. 270). They are the positive and negative poles of the same magnet—opposite sides of the same shield."

This court has not had occasion to notice this provision of our state constitution, but in the case of *State ex rel. Lowman & Hanford Stationery & Printing Co. v. Riplinger*, 30 Wash. 281, 70 Pac. 748, a similar provision in the freehold charter of Seattle was involved. The charter provided, among other things,

"That if more than one amendment be submitted at the same general election the same shall be submitted at such election in such manner that each proposed amendment may be voted on separately without prejudice to the others."

The charter was amended by submitting to the people, as a single proposition, an article relating to "the library department." This proposed amendment constituted several sections providing in some considerable detail for the administration of that department. While it related to that one general subject, it was plainly susceptible of being divided into several propositions so that an elector might consistently favor one and oppose the others. It was held to be one amendment within the meaning of the charter provision above quoted requiring amendments to be submitted to the people separately. Justice Dunbar, speaking for the court, said:

"As is well said by the respondents, 'There is no more reason in case of amendment in requiring each section to be separately submitted than for requiring each sentence to be so submitted;' that is the unity of subject that is demanded by the charter provision requiring each amendment to be submitted separately. It appears evident from the language of the amendment that it was the intention that the new provision, as a whole, should be substituted in lieu of the old provision, as a whole. That being so, the voter was not deprived of the right to exercise his choice in voting upon the amendment."

The following decisions of the courts involving constitutional amendments made under constitutional provisions in substance the same as our own are in harmony with these

views: *Gabbert v. Chicago, R. I. & P. R. Co.*, 171 Mo. 84, 70 S. W. 891; *People ex rel. Elder v. Sours*, 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34; *People v. Prevost*, 55 Colo. 199, 134 Pac. 129; *Chicago v. Reeves*, 220 Ill. 274, 77 N. E. 237; *State ex rel. Teague v. Board of Com'rs of Silver Bow County*, 34 Mont. 426, 87 Pac. 450; *Lobaugh v. Cook*, 127 Iowa 181, 102 N. W. 1121.

There have come to our notice but two decisions of the courts which we regard as being opposed to the views expressed in the above noticed decisions. They are *State ex rel. McClurg v. Powell*, 77 Miss. 543, 27 South. 927, 48 L. R. A. 652, and *McBee v. Brady*, 15 Idaho 761, 100 Pac. 97. The *Powell* case seems to have been expressly overruled in the later case of *State v. Jones* (Miss.), 64 South. 241, 469. *McBee v. Brady* may possibly be distinguished from the decisions above noticed and from the case before us in the number of subjects covered by the proposed amendment to the constitution of Idaho submitted as one proposition. If not so distinguishable, we think it, as well as the *Powell* case, must be regarded as being opposed to the great weight of authority.

In *Ellingham v. Dye*, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915 C. 200, a question akin to that before us was presented. The legislature submitted to the people, as a single proposition, an entirely new constitution. This, it was held, could not be done under the constitutional power of the legislature to submit amendments only, and those separately. Manifestly, this was the submission of more than one amendment as a single proposition.

In *Lozier v. Alexander Drug Co.*, 23 Okl. 1, 99 Pac. 808, there was an attempt to submit a constitutional amendment and the question of approval or rejection of an act of the legislature as a single proposition. This was held to be an unlawful submission. This decision plainly is of no aid to the solution of the problem here involved.

It is strenuously argued that the initiative and referendum are separate subjects within the meaning of our constitutional provision requiring different amendments to be submitted separately, because the initiative is purely legislative and the referendum is negative in character, partaking more of the veto power, which power is ordinarily vested in the executive. We have seen, in the above quotations from the Montana court in *State ex rel. Hay v. Alderson, supra,* that that court regards the referendum more in the nature of a method of referring a bill to another house or branch of the legislature, as a bill goes to the senate or the house after being introduced and passed in the other body, rather than as an exercise of a power likened to the veto. However this may be, it is elementary that, while the veto power is ordinarily exercised by that person possessing the executive power, it is not an executive power, but a legislative power. Speaking of the king's prerogatives, among which is that of the veto power, Blackstone tells us in Book 1 at page 261:

"First, he is a constituent part of the supreme legislative power; and, as such, has the prerogative of rejecting such provisions in parliament as he judges improper to be passed."

Judge Cooley in his Principles of Constitutional Law, at pages 51 and 52, says:

"The power to veto legislation, which is conferred upon the president, makes him in effect a third branch of the legislature. The power is legislative, not executive, and the questions presented to his mind are precisely the same as those the two houses of Congress must determine in passing a bill. Whether the proposed law is necessary or expedient, whether it is constitutional, whether it is so framed as to accomplish its intent, and so on, are questions transferred from the two houses to the president with the bill itself."

In Black's Constitutional Law, at page 113, that learned author observes:

"This power vested in the president is not executive in its nature, but essentially legislative. It makes him, in effect,

a branch of Congress, though only to a limited and qualified extent."

In the text of 36 Cyc. 958, we read:

"Under the system of government adopted in this country the chief executive, either the president or a governor, is a part of the law-making power."

Numerous authorities are there collected showing that the real nature of the veto power is legislative.

These considerations, it seems to us, render it plain that the seventh amendment to our constitution, vesting legislative power in both the legislature and the people, and withholding from the governor the veto power as to initiative and referendum measures, deals with the one subject of legislative power, and that such vesting of that power, and, incidentally thereto, the defining of the manner and means of its exercise, is the one sole object and purpose of the amendment. That it could have been submitted to the people as more than one proposition, to our minds argues only that such different possible propositions have to do only with matters incidental to the one purpose. The fact that the mode of exercising the power by referendum is negative, or that it might be even regarded as a veto power, does not change the fact that such power is legislative. So, in its final analysis, the language added to section 1 of article 2 of the constitution by the seventh amendment provides only for the participation by the people in legislation by their direct vote. All else found in the amendment is but incidental to this object and purpose. The amendment is to but one section of the constitution, it deals with one subject and looks to the accomplishment of one purpose.

We conclude that the seventh amendment to the constitution did not fail of lawful adoption because of the fact that it was submitted to the people as one proposition.

It is contended by counsel for appellants that the seventh amendment to the constitution was not lawfully submitted to

the people, in that it was not published prior to the election at which it was voted upon, as required by that portion of article 23 of the constitution reading as follows:

"The legislature shall also cause the amendments that are to be submitted to the people to be published for at least three months next preceding the election, in some weekly newspaper, in every county where a newspaper is published throughout the state."

It is insisted that the publication of the proposed amendment was defective in several of the counties of the state, in that it was not published therein the required period "next preceding" the election at which it was voted upon. The facts showing this claimed defect in the publication are sought to be brought before us by stipulation of counsel for the respective parties to this action, counsel for respondents reserving, however, their objections to the relevancy of such facts and to the court taking judicial notice of them. This branch of the case, to our minds, presents the most difficult problem in the entire controversy, the importance of the correct solution of which cannot be overestimated. Viewed as a fundamental principle of orderly constitutional government, nothing seems more important than that the mandates of the constitution touching the procedure to be followed in bringing about changes therein by amendment should be followed by those to whom such mandates are directed. It may seem equally important that the courts should declare void and of no effect any attempted amendment to the constitution which is not attended by those things prescribed by the constitution itself as prerequisite to the bringing about of its amendment. This, it is now beyond question, the courts have power to do; more, it is their solemn duty to do, when the want of constitutional prerequisites is of a substantial nature *and such that the courts can judicially know that there has been such want of constitutional prerequisites.*

Important as these things are, and plain as the power and duty of the courts may be in such cases, it is of no less con-

sequence that the courts must never declare void and of no effect a constitutional amendment when *all of the facts which are within the realm of the judicial knowledge* touching its submission and adoption by the people point to its lawful submission and adoption, whatever other facts may exist pointing to the contrary. If it be the duty or privilege of the courts to look to facts beyond the realm of judicial knowledge, which, generally speaking, is limited to facts evidenced by public records and facts of general notoriety, in determining the question of the lawful existence of a constitutional amendment, then, indeed, does the existence of such an amendment rest upon an uncertain foundation, varying in its supporting strength according as each litigant, in innumerable possible cases, might be able to prove or disprove facts outside the realm of judicial knowledge touching details of its submission and adoption by the people. To give sanction to such a doctrine would leave the lawful existence of this and every other amendment to our constitution an open question, to be tried out as a question of fact as many times as there might be different cases drawing its existence in question, even a generation hence. Surely the existence of our written law, whether constitutional or statutory, does not rest upon such a precarious support.

The arguments of counsel on both sides proceed upon the theory that, in so far as the court is called upon to notice facts in determining the question of the legal existence of the seventh amendment, only such facts are proper to be considered as the court can judicially notice. Manifestly, the court could not proceed upon any other theory, since this is not in any sense a trial of an issuable fact. The facts here controlling must be regarded as absolute facts, not tentative, *prima facie* or questionable facts; not facts to be proven or in any sense the subject of proof, but facts which the court is bound to judicially know as absolutely true or not true, and from which it must say that the seventh amendment has or

has not become a part of our constitution.  In other words, the answer to our problem must be absolute.  Our answer must, at least theoretically, rest upon facts capable of being judicially noticed without proof, which will furnish the same answer at all times to all men, though the courts may never have spoken upon the subject.  This being the nature of our problem, in so far as facts enter as an element into its solution, it seems to follow, as a matter of course, that stipulations or admissions of counsel as to what the facts are can be of no controlling force whatever, though possibly the court may look to such stipulation or admission to refresh its memory, as calling its attention to facts within the realm of judicial knowledge, as it would look to an almanac to be reminded of the day of the month, or to a historical work to be reminded of the date of some prominent historical event of such notoriety as to come within the realm of judicial knowledge, or to official records of public acts.  Stipulations or admissions of counsel cannot bring facts within the sphere of judicial knowledge which in law do not belong there.  Such is the well settled rule.  Among the decisions so holding, we note the following:  *Freeholders of Passaic v. Stevenson*, 46 N. J. L. 173; *Legg v. Mayor etc. of Annapolis*, 42 Md. 203; *Attorney General v. Rice*, 64 Mich. 385, 31 N. W. 203; *Fullington v. Williams*, 98 Ga. 807, 27 S. E. 183; *State v. Boise*, 5 Idaho 519, 51 Pac. 110; *Harrison v. People*, 57 Colo. 137, 140 Pac. 203.  We proceed, then, in the light of judicial knowledge alone, in so far as we are to be controlled by facts touching the proper submission of the seventh amendment to our constitution.

· If we were asked to look alone to facts which the constitution or statute requires to be evidenced by public record, our task would be freed from much of its attendant difficulty; but counsel for appellants ask us to take judicial notice of facts which they claim show defective publication of the seventh amendment in the several counties of the state prior to the election at which it was voted upon.  Now, neither the con-

stitution nor the statute of our state requires the publication of a proposed amendment to the constitution to be evidenced by any official record thereof to which the court could look and judicially know that the publication prescribed has or has not been made. So far as officially recorded facts are concerned, it may be said that we know judicially that the legislature of 1911 passed an act proposing the seventh amendment to the people at the general election of 1912; that such proposal was duly evidenced by proper entries upon the journals of the senate and house of representatives; that, by section 2 of that act, the legislature provided for publication of the amendment prior to the election, as required by article 23 of the constitution; that at that election there were cast for the adoption of the proposed amendment 110,110 votes, and against its adoption, 43,905 votes; and that, upon a canvass of the election returns, on file and of public record as the law requires in the office of the secretary of state, showing this result, the governor, on December 28, 1912, issued his proclamation as required by article 23 of the constitution, in which he proclaimed the fact that "said amendment has been adopted, and that the same is now a part of the constitution of the state of Washington."

There may be other officially recorded facts we could judicially notice if necessary, but no officially recorded fact, that is, no fact required by constitution or statute to be recorded, and no fact of such notoriety as to bring it within the realm of judicial notice, answers the question of whether the publication of the proposed amendment, prior to the election at which it was voted upon, was or was not made as the constitution prescribes. By what process of reasoning, then, are the facts determinative of this question to be noticed by the courts? If outside the realm of judicial notice, must we not conclusively presume that the publication was made in obedience to the requirements of the constitution by those to whom the constitution and statutes, enacted in pursuance thereof, intrusted such duty? An affirmative answer to this

question seems inevitable, unless the facts are to be judicially noticed by the courts upon the ground of notoriety. This seems impossible in view of the nature of the facts which it is sought to have us judicially notice.

The limits of judicial notice are not capable of being prescribed in general terms with any degree of exactness; but it seems plain from the authorities that notoriety is, generally speaking, the ultimate test when facts sought to be brought within the realm of judicial notice are of the nature we are here asked to notice. In 1 Greenleaf on Evidence (16th ed.), p. 8, it is said:

"The general principle of judicial notice is simple and natural enough. In general, it covers (1) matters which are so notorious that the production of evidence would be unnecessary; (2) matters which the judicial function supposes the judge to be acquainted with, either actually or in theory; (3) sundry matters not exactly included under either of these heads."

Professor Jones in his Commentaries on Evidence, vol. 1, § 105, observes as follows:

"General rules have often been prescribed for determining what facts are, and what are not, matters for judicial cognizance, yet such rules are necessarily too vague and general in their character to afford very valuable aid to the practitioner. Certain facts may be said to be the subject of judicial notice because they are part of the *law of the land*, which is presumed to be generally known. Other facts may be properly the subject of judicial notice, because they relate to the organization and *duties of the court* and its officers, and hence may be said to be peculiarly within the cognizance of the judge. But when we pass from facts of the character already mentioned, the principal guide in determining what facts may be assumed to be judicially known is that of *notoriety;*"

In Wade on the Law of Notice, at § 1403, we read:

"The classes of facts of which notice will be taken are judicial, legislative, political, historical, geographical, commercial, scientific and artistic, in addition to a wide range

of matters arising in the ordinary course of nature, or the
general current of human affairs, which rest entirely upon
acknowledged notoriety for their claims to judicial recog-
nition."

In Bouvier's Law Dictionary (Rawle's 3d Revision), at
page 1734, judicial notice is defined as follows:

"A term used to express the doctrine of the acceptance by
a court for the purposes of the case, of the truth of certain
notorious facts without requiring proof.

"It is the process whereby proof by parol evidence is dis-
pensed with, where the court is justified by general consider-
ations in assuming the truth of a proposition without requir-
ing evidence from the party setting it up. See Wigm. Ev.
§ 2565. This power is to be exercised with caution. Care
must be taken that the requisite notoriety exists. Every
reasonable doubt should be resolved promptly in the nega-
tive."

In the text of 16 Cyc. 850, we read:

"Judicial knowledge is not reached by the use of evidence;
it is a matter pertaining to the judicial function and its
existence, like that of an admission, stipulation, or rule of
presumption, dispenses with evidence as to the point covered.
It is necessary, however, that the community throughout
which the fact to be judicially known is supposed to be com-
monly known should be one whose extent bears some reason-
able relation to the territorial jurisdiction of the court itself."

See note in 4 L. R. A. 38.

There have been a great number of decisions rendered by
the courts which may be regarded as showing the inexact-
ness of the rule of general notoriety as defining the limits of
notice. This want of exactness, however, comes from the dif-
ficulty in many cases of determining what is sufficient no-
toriety of a given fact to bring it within the judicial notice
of the court.

After a painstaking examination of the numerous decisions
called to our attention by counsel, and also others coming to
our notice, we believe it safe to assert that no court, so far
as can be determined from the reported decisions, has ever

judicially noticed facts touching the sufficiency of the publication of a constitutional amendment or a statute, which publication was required by law prior to the adoption of such amendment or the enactment of such a statute, where neither the constitution nor the statute made provision for preserving some official record touching the fact of such publication, except in cases where the propriety of the court taking judicial notice of such facts was not in the least drawn in question.

The decision which seems to us most directly in point as lending support to the contention of counsel for appellants touching this question is that of *State ex rel. Woods v. Tooker*, 15 Mont. 8, 37 Pac. 840, 25 L. R. A. 560. In that case there was drawn in question the adoption of a constitutional amendment which was held to have failed of lawful adoption because of its defective publication prior to the election at which it was voted upon. Assuming that neither the constitution nor the statute of Montana made any provision for preservation of any official record of facts touching the making of the required publication, as to which the decision is silent, it seems that the court did take notice of facts going to show the insufficiency of such publication. We look in vain in that decision, however, for any challenge to the power of the court to rightfully judicially notice such facts. Just how the facts were called to the attention of the court in that case is not clear from the decision.

The decision which may be regarded as next in order of importance as lending support to appellants' contention upon this subject is that of the supreme court of Nevada in *State ex rel. Galusha v. Davis*, 20 Nev. 220, 19 Pac. 894. What we have said relative to the decision in *State ex rel. Woods v. Tooker* is equally applicable to this decision. The question of judicial notice extending to facts going to show insufficiency of publication prior to the election at which the constitutional amendment there involved was voted upon was not presented to or considered by the court, so far as can be determined from the reported decision.

The decision of the supreme court of Kentucky in *Mc-Creary v. Speer*, 156 Ky. 783, 162 S. W. 99, also seems to lend some support to the contention of counsel for appellants touching the question of the sufficiency of the publication. But that case was submitted to the court upon facts stipulated by counsel, and the opinion fails to disclose any mention or discussion of the question of the propriety of the court drawing to itself by judicial notice facts necessary to a determination of the sufficiency of the publication.

No other decision has come to our notice holding a constitutional amendment void, rested alone upon the ground of want of sufficient publication prior to the election at which it was voted upon. We proceed, however, to notice a number of decisions which counsel for appellants place reliance upon as touching this branch of the case.

In *Russell v. Croy*, 164 Mo. 69, 63 S. W. 849, the court considered and reviewed the question of the sufficiency of a publication of a constitutional amendment and declined to hold the amendment void upon that ground, but did hold it void as being in violation of rights guaranteed by the Federal constitution. The question of the propriety of the court taking judicial notice of facts which were claimed to show the defective publication was not noticed. Indeed, the question of insufficiency of the publication was wholly unnecessary to a decision of the cause in view of the ground upon which the amendment was held void.

In the famous Kansas *Prohibitory Amendment Cases*, 24 Kan. 700, much is said in a general way by the learned writer of that opinion touching the extent of judicial notice. There was not, however, involved in that case any question of judicial notice of facts other than such facts as were evidenced by official records. The sufficiency of the publication of the proposed amendment prior to the election at which it was voted upon was not questioned. The amendment, however, was upheld as against other contentions which were determinable from officially recorded facts.

In *In re House Resolution No. 10*, 50 Colo. 71, 114 Pac. 293, the supreme court of Colorado rendered its decision in response to a resolution and interrogatories of the house of representatives touching the question of the constitutionality of the method of publication provided for in a bill pending in the legislature which contemplated the submission to the people of a constitutional amendment. Manifestly, no question of fact was there presented which was beyond the court's judicial knowledge, because the bill upon its face furnished all the facts the court was called upon to consider incidental to the question of law presented.

In *Hammond v. Clark*, 136 Ga. 313, 71 S. E. 479, 38 L. R. A. (N. S.) 77, there was drawn in question the sufficiency of the form in which the publication of a proposed amendment to the constitution was made. But the question was plainly determinable from a public record, to wit, the governor's proclamation, which the general assembly directed the governor to make and publish and which contained the entire act proposing the amendment. It was not a question of the extent of the publication that was actually made, but as to the form of it, which, of course, was determinable from the face of the governor's proclamation, a public document. The proclamation, so far as its form was concerned, was held sufficient.

In *McConaughy v. Secretary of State*, 106 Minn. 392, 119 N. W. 408, there was drawn in question the sufficiency of a publication of a constitutional amendment prior to the election at which it was voted upon, apparently as a question of fact, in a statutory election contest timely initiated. Manifestly, under such circumstances, the question of the extent of the publication was determinable as a question of fact. Of course, the court in that case could determine the facts from proof, as in any trial of a question of fact, and was not confined to facts of which it could take judicial notice without proof, as in the case before us.

In *Hildreth v. Taylor* (Ark.), 175 S. W. 40, there was drawn in question a constitutional amendment upon the ground of insufficiency of the publication thereof preceding the election at which it was voted upon. The court held the amendment to have failed of adoption because of its failure to receive a sufficient number of votes. The court, however, did notice, and to some extent examined, the question of the sufficiency of the publication, and while it was not necessary for the court to express its opinion touching the effect of the claimed defective publication, yet in view of the fact, that, as under our law and constitution, the constitution and laws of Arkansas made no provision for preservation of any record of the facts touching the extent of the publication, the following language of the court in that case is of interest in this connection:

"The legislature has provided no record whereby the fact can be definitely ascertained whether or not the publication has been made as directed, therefore it would be disastrous to hold that a statute or amendment to the constitution could be defeated by showing that the publication in fact was not made in accordance with the specified terms."

This language comes as near touching the question of judicial notice as here involved, as that of any decision which has come to our notice. Indeed, no other language of any decision coming to our attention suggests thought of the question, as here involved.

In *Worman v. Hagan,* 78 Md. 152, 27 Atl. 616, 21 L. R. A. 716, it was held that the governor's proclamation declaring that certain amendments submitted to the vote of the people had received a majority of the votes cast and thereby had been adopted by the people as a part of the constitution, was conclusive upon the courts. This holding was rested upon the language of the Maryland constitution. It is worthy of note, however, that there was not drawn in question in that case any facts other than officially recorded facts, even had

the court felt called upon to go behind the governor's proclamation.

In *State ex rel. Van Deusen v. Williams*, 143 Ala. 501, 39 South. 276, there was presented a situation where the court took judicial notice of facts touching the sufficiency of a publication required by the constitution as a prerequisite to the legislature passing a special law. A critical reading of that decision, however, will show that the court could take judicial notice of the publication or want thereof because of the fact that the constitution expressly provides for the preservation of record evidence of the publication, and also provided that "the courts shall pronounce void every special, private or local law which the journals do not affirmatively show was passed in accordance with the provisions of this section." A similar situation was presented in *Freeholders of Passaic v. Stevenson*, 46 N. J. L. 173.

In the following decisions the courts noticed the question of the sufficiency of publication made prior to the adoption of constitutional amendments and held such publications sufficient. In none of them, however, was the question of judicial notice reviewed or mentioned. *State ex rel. Torreyson v. Grey*, 21 Nev. 378, 32 Pac. 190, 19 L. R. A. 134; *State ex rel. Hay v. Alderson*, 49 Mont. 387, 142 Pac. 210; *State ex rel. Thompson v. Winnett*, 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. (N. S.) 149. In the following cases the question of the validity of constitutional amendments was decided upon officially recorded facts. *Collier v. Frierson*, 24 Ala. 100; *State v. Swift*, 69 Ind. 505; *In re Denny*, 156 Ind. 104, 59 N. E. 359, 51 L. R. A. 722; *Ellingham v. Dye*, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915 C. 200; *Koehler v. Hill*, 60 Iowa 543, 14 N. W. 738, 15 N. W. 609; *State ex rel. Dawson v. Sessions*, 87 Kan. 497, 124 Pac. 403; *Dayton v. St. Paul*, 22 Minn. 400; *State ex rel. Marr v. Stearns*, 72 Minn. 200, 75 N. W. 210; *Rich v. Board of State Canvassers*, 100 Mich. 453, 59 N. W. 181; *Trustees of University of North Carolina v. McIver*, 72 N. C. 76; *Ramsey v. Per-*

*singer,* 43 Okl. 41, 141 Pac. 13; *Kadderly v. Portland,* 44 Ore. 118, 74 Pac. 710, 75 Pac. 222; *Bett v. Secretary of State,* 63 N. J. L. 289, 43 Atl. 744, 881, 45 L. R. A. 251.

Counsel for appellants rely upon our decision in *Cudihee v. Phelps,* 76 Wash. 314, 325, 136 Pac. 367, in support of their contention that we should take judicial notice of facts showing the extent of the publication of the seventh amendment in the several counties of the state prior to the election at which it was voted upon. It is true we said in that case, "it is conceded that the secretary of state did publish the proposed amendment three full months next preceding the general election of 1912, in a weekly newspaper and published it in each and every county of the state." Counsel seem to argue that this is the taking judicial notice of facts of the same nature we are here asked to judicially notice. A critical reading of that decision, we think, will show that there was no question raised in that case as to the sufficiency of the publication of the recall amendment to the constitution there involved, except as the sufficiency of such publication could be determined as a matter of law from the terms of the constitution and the act of the legislature proposing the amendment. There was no question made in that case as to the extent the publication was actually made. It was insisted that the publication was not made in accordance with the constitution, upon the sole ground that the proposing act, which also provided for the publication, did not comply with the constitution as to the time it prescribed for the publication. We held, however, that, reading the act in the light of the constitutional provision requiring the legislature to cause the publication of proposed amendments to be made, it meant the same as the constitution, in so far as the time of publication was concerned. The question there presented, in its last analysis, was manifestly one as to what the law was, rather than as to what actually occurred touching the making of the publication. No question of the propriety of the court

taking judicial notice of the extent of the publication was actually made, was involved, or even suggested in that case.

Counsel for appellants invoke at almost every angle of their argument the doctrine that constitutional provisions are mandatory, except as by express words they may be indicated to be otherwise. That such is the generally accepted doctrine touching the duties the constitution puts upon those it charges with the observance of its provisions, seems now well settled by the decisions of the courts. Such, in any event, is the rule in this state by the express language of § 29, article 1, of our constitution, reading as follows:

"The provisions of this constitution are mandatory, unless by express words they are declared to be otherwise."

Article 23, § 1, of the constitution provides in part as follows:

"The legislature shall also cause the amendments that are to be submitted to the people to be published for at least three months next preceding the election, in some weekly newspaper, in every county where a newspaper is published throughout the state."

It is argued that this is a mandatory provision of the constitution, not only addressed to the legislature and in turn to those who by the legislature are charged with the duty of making the publication, but also to the judicial department of the government, and charges it with the duty of enforcing to the extent of declaring void every constitutional amendment the adoption of which is not attended by such required publication, regardless of the ability of the court to lawfully draw to itself such knowledge of facts as will enable it to know that such mandate has or has not been complied with by those charged with the duty of making the publication. Were the facts involved in this contention required to be evidenced by official record in accordance with some constitutional or statutory provision, to which record the court could look and know that the publication had or had not been made as prescribed, as, for instance, it can look to the entries

upon the journals of the senate and house of representatives, showing the proposal and vote upon a constitutional amendment, as we did in *Cudihee v. Phelps, supra,* there would be substantial ground for this contention to rest upon.

The doctrine of the provisions of a constitution being mandatory, as unquestioned and firmly established as it is, falls far short of solving this problem. Manifestly, that doctrine has its limitations in a case like this, in so far as the power of the courts are concerned. If it be true, as we think it is, that the facts touching the sufficiency of the publication of the seventh amendment are beyond judicial notice, then it may be said, without belittling or detracting an iota from the importance of that doctrine, that, as applied to the real problem here for solution, it becomes little else than a "glittering generality." There are those who seem to regard the courts as the only guardians of the constitution, and that nothing wrongfully or mistakenly done, or left undone, by those charged with constitutional duties can escape the correcting power of the courts. That this is fallacious needs little reflection to demonstrate. Of course, when it comes to considering individual rights such as are protected by the guaranties, that the right to trial by jury shall remain inviolate; that no person shall be deprived of life, liberty or property without due process of law; that no law shall grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens; and many other constitutional guaranties that look to protection of personal rights, the courts have ample power, and will go to any length within the limits of judicial procedure, to protect such constitutional guaranties.

But in that large field of governmental activity having to do with public affairs only, there are many things that might be done or left undone in derogation of mandatory constitutional provisions which the courts would be powerless to correct. Would not the courts be wholly without such correcting power in all cases where it is not possible for them

to know the facts pointing to such violation or neglect of constitutional duty? It seems so to us. Again, suppose the legislature had neglected to obey the constitutional mandate that it shall pass the necessary laws to render effective the recall amendment to the constitution. It is not at all uncommon for constitutions to contain commands to the legislature to pass laws upon given subjects; there are other commands akin to this in our constitution. It is manifest that the courts have no power to correct such a violation or neglect of constitutional duty, though nothing seems plainer than that such constitutional provisions are mandatory in the constitutional sense. Manifestly, such provisions are no less mandatory, nor is the duty imposed thereby any less sacred, because of the fact that the courts may be powerless to enforce such mandates. Those vested with legislative and executive powers of the state have duties and obligations resting upon them by the mandates of the constitution for the performance of which they are answerable alone to their own consciences and to the people; just as the courts have duties and obligations resting upon them by the mandates of the constitution for the performance of which the judges are answerable alone to their own consciences and to the people. It will not do to say that, because there may be no correcting remedy for neglect of legislative or executive duties, the courts, by that fact alone, acquire some correcting power over legislative and executive acts. Our constitution is not framed upon the assumption that official integrity resides alone in the courts. Some things, though mandatory, are entrusted for their performance to the legislative and executive branches of the state government, branches coequal, within their spheres, with the courts.

Touching the procedure of the legislature in the enactment of laws, our constitution provides that "each house shall keep a journal of its proceedings" (Const., art. 2, § 11); that,

"No bill shall become a law unless, on its final passage, the vote be taken by yeas and nays, the names of the mem-

bers voting for and against the same be entered on the jour-
nal of each house, and a majority of the members elected to
each house be recorded thereon as voting in its favor" (Const.,
art. 2, § 22) ;

yet, in *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac.
201, 23 L. R. A. 340, this court held that an enrolled bill,
signed by the president of the senate and the speaker of the
house and approved by the governor, evidencing the exist-
ence of a law, is conclusive upon the courts of the due pas-
sage of such law by the legislature, notwithstanding the pro-
visions of the constitution above quoted requiring record
facts to be preserved, which it might well be argued the
courts could look to and of which they could take judicial
notice. The following observations of Judge Hoyt, speak-
ing for the court, in that case we think are worthy of repeti-
tion in this connection:

"If such signing and approval are only steps, then the
fact that they have been taken in no manner proves that any
other required step has been taken, and it must follow that
before the courts can find that the bill has become a law, they
must look and see that all the steps required by the constitu-
tion to constitute it such have been observed by the legis-
lature. Such a construction given to the enrolled act would
render it practically impossible for the courts even to de-
termine what was the law, and would render it absolutely im-
possible for the average citizen to ascertain that of which
he must at his peril take notice. There is enough injustice
in requiring the citizen to take notice of the statute law,
when to do so he has only to determine the legal effect of
the enrolled acts on file in the office of the secretary of state,
and if he is further required to take notice of all that is
shown by the journals of the legislature which may affect
the regularity with which such acts have been passed, he will
indeed be in a sorry condition. The absolutely disastrous
result of this construction has led the courts which have held
that they could go behind the enrolled act to adopt the
theory, which seems to us to be entirely illogical, that the en-
rolled acts *prima facie,* but not conclusively, establish the
fact of their regular enactment. Such holding compels the

further one that whenever the attention of the courts is directed to the particular parts of the journal which show a want of compliance with constitutional requirements, the courts must take judicial notice of all facts therein contained in relation to the point to which their attention has thus been called, and if such journals show any want of compliance with the mandates of the constitution, declare such *prima facie* presumption overcome and the law invalid. The result of this construction will lead to results as disastrous and embarrassing as would the other construction of which we have been speaking. For a number of years after the passage of an act it may be given force by the courts by reason of the *prima facie* presumption flowing from the finding of the act regularly enrolled and signed in the office of the secretary of state. Then after said act to all intents and purposes has been treated as in force during all of these years, upon the suggestion of some person that there was a fatal omission in the journal entries regarding the passage thereof, the court must take judicial notice of such fact if shown by the journal, and from that time on it must be held not only that such bill was not then a law, but that it never had been such. The confusion as to rights and duties growing out of such a state of uncertainty as to what the statute law of the state is may well appall one who even superficially contemplated the same. . . .

"It may be accepted as a fact that all of the courts hold that these enrolled bills are *prima facie* the law, and that they must be given force as such until their invalidity is suggested in some proceeding. Yet to hold that this *prima facie* presumption attaches, and a conclusive one does not, seems to us to be illogical in the highest degree. Besides, there is something ridiculous in holding that there can be such a thing as a *prima facie* law. It is true that it is frequently the duty of courts and citizens to accept certain things as *prima facie* proof of what the law is, but that is an entirely different proposition from holding that a certain thing is *prima facie* a law. An act of the legislature, when regularly on file in the office of the secretary of state, is, and must necessarily be, either a law or not a law, and it is preposterous to hold that that which is the law is so only *prima facie*, or to hold that that which is in fact not a law is even *prima facie* so. What constitutes the statutory law of a state must

necessarily be an absolute proposition, and not simply a *prima facie* one."

Now, in the light of these observations and the conclusions the court there reached, wherein there was ignored certain officially recorded facts, which, as we have said, it could be well argued were within the judicial knowledge of the court, how can it be consistently held that we must now take judicial notice of facts touching the sufficiency of the publication of the seventh amendment prior to the election at which it was voted upon, which are not required to be evidenced by any official record, and which are not of such general notoriety that they could for that reason be judicially noticed? All this argues that we might have ceased our inquiry upon looking to the governor's proclamation. We prefer, however, not to rest our decision of this question upon the conclusiveness of the governor's proclamation, though whether our inquiry might be so limited we do not now decide; but we do rest it upon officially recorded facts of which we may take judicial notice, to wit, the act proposing the seventh amendment, the journal entries of the senate and house of representatives, the fact of the holding of the election and the returns thereof on file in the office of the secretary of state, and the governor's proclamation of the adoption of the seventh amendment and its becoming a part of the constitution of our state.

Much has been said in the argument as to the threatened dangers to our constitution in the event we decline to correct this alleged violation of its mandate. Again, let us be reminded that the courts are not the sole guardians of the constitution, and while it is necessary that each department of the government heed the mandates of that instrument, it is no less important that the courts should not reach out beyond their constitutional sphere to question and draw to themselves duties and powers which belong to the other departments of the government. In *State ex rel. Reed v. Jones*,

*supra*, touching this thought, Judge Hoyt, speaking for the court, also observed:

"To preserve the harmony of our form of government it must be held that these several mandatory provisions are addressed to the department which is called upon to perform them, and that neither of the other departments can in any manner coerce that department into obedience thereto. Courts have gone behind the final records of the legislative department upon what seems to us a false theory. They have assumed that the mandatory provisions of the constitution are safer, if the enforcement thereof is entrusted to the judicial department, than if so entrusted to the legislature; in other words, they have acted upon the presumption that their department is the only one in which sufficient integrity exists to insure the preservation of the constitution. How the courts have obtained this idea is somewhat difficult to ascertain but that they entertain it, and have allowed it to influence their decisions, is so evident that even a superficial examination of such decisions will satisfy any one of the fact."

Similar observations, which we think are worthy of quotation here, were made by Justice Bryan of the supreme court of Maryland in *Worman v. Hagan*, 78 Md. 152, 165, 27 Atl. 616, 21 L. R. A. 716, as follows:

"It may be asked what is to be done in case the governor should violate his duty, and wrongfully proclaim an amendment as adopted which in point of fact had been rejected. It would not be becoming in this court to suppose that such a contingency would ever happen. The courtesy due to the executive department forbids us to entertain such a conjecture. But if, unhappily, in future times, it ever should occur, assuredly a sufficient remedy will be found. The resources of a free government are ample, and will always be found adequate to punish and redress offenses against its sovereignty. Having neither the means nor the jurisdiction to determine the result of the voting on the amendment, we disclaim all intention to investigate the question."

These remarks, it is true, were made in connection with the holding of that court that the proclamation of the gov-

ernor was conclusive by reason of the particular language of the constitution of Maryland, but they are equally applicable here to the view that the courts must in any event confine their inquiry within the realm of judicial notice, when there is drawn in question before them the existence of any written law, whether it be constitutional or statutory.

We are of the opinion that, since all of the facts within our judicial knowledge point unerringly to the regular submission and adoption of the seventh amendment to the constitution, we must now conclusively presume that all required steps incidental to the submission and adoption of that amendment which are beyond the limits of our judicial knowledge have been done and had as prescribed by the constitution, and that it is now a valid part of our organic law.

Next in order comes the contention of counsel for appellants that initiative measure No. 3, relating to intoxicating liquors, has not become a valid law, in that it was not lawfully submitted to or adopted by the people, though the seventh amendment to the constitution authorizing this method of legislation has become a valid part thereof. It is first insisted in this behalf that initiative measure No. 3 was not published prior to the election of November, 1914, at which it was voted upon, as required by the seventh amendment to the constitution and ch. 138, p. 418, of the Laws of 1913, passed by the legislature in pursuance thereof to facilitate the operation of the initiative and referendum. The provision of the seventh amendment invoked in this behalf, reads:

"The legislature shall provide methods of publicity of all laws or parts of laws, and amendments to the constitution referred to the people with arguments for and against the laws and amendments so referred, so that each voter of the state shall receive the publication at least fifty days before the election at which they are to be voted upon."

In pursuance of this provision, the act of 1913 was passed, providing in some considerable detail procedure touching

initiative and referendum legislative powers by the people.
Among other things, section 29 of that law provides:

"Not less than fifty-five days before any election at which
initiative or referendum measures are to be submitted to the
people, the secretary of state shall transmit, by mail with
postage fully prepaid, to every voter in the state whose ad-
dress he has, or can with reasonable diligence ascertain, one
copy of the pamphlet hereinabove provided for."

This refers to pamphlets containing the submitted meas-
ure or measures, with arguments for or against the same,
which are to be prepared as the law prescribes in preceding
sections thereof.   Touching the return, canvass and evidenc-
ing of the vote upon a measure, § 30 of that act provides:

"The votes on the initiative and referendum measures sub-
mitted to the people, as in this act provided, shall be counted,
canvassed and returned by the regular precinct election
officers, and by the county auditors, in the manner provided
by law for canvassing and returning votes for candidates for
state offices.   It shall be the duty of the secretary of state, in
the presence of the governor, within thirty days after any
such election to canvass the votes for each measure and cer-
tify to the governor the result thereof, and the governor
shall forthwith issue his proclamation giving the whole num-
ber of votes cast in the state for and against such measure,
and declaring such measures as are approved by the major-
ity of those voting thereupon, provided that the vote cast
upon such measure shall equal one-third of the total vote cast
at such election, to be the law of the state of Washington
from the date of such proclamation."

The seventh amendment to the constitution is itself silent
upon these matters.   It simply provides:

"Any measure initiated by the people or referred to the
people as herein provided shall take effect and become the law
if it is approved by a majority of the votes cast thereon."

Now, neither the constitution nor any statute of the state
makes any provision for the preservation of any official record
evidence of the facts touching the sufficiency of the publica-
tion of initiative and referendum measures.   Hence it would

seem that we are here confronted with a problem of the same
nature as that presented by counsel for appellants in their
challenge to the submission and adoption of the seventh
amendment to the constitution, which we have already noticed.
Here we are again asked to take judicial notice of facts of
which there is no official record evidence, nor are they facts of
such notoriety as bring them within the realm of judicial
knowledge. It may be said, as in our discussion of the chal-
lenge to the seventh amendment to the constitution, that we
know judicially that initiative measure No. 3 relating to in-
toxicating liquors was initiated by petition; that it was sub-
mitted to, and voted upon by, the people at the general elec-
tion of November, 1914; that 381,643 electors voted at that
election; that there were cast for the adoption of initiative
measure No. 3, 189,840 votes, and against its adoption, 171,-
208 votes, 361,048 electors thereby voting upon the measure;
that upon a canvass of the returns of that election filed in
the office of the secretary of state showing this result, the
governor, in accordance with the provision of the act of 1913
above quoted, passed to facilitate the operation of the seventh
amendment to the constitution, on the 5th day of December,
1914, issued his proclamation proclaiming such result to the
people of the state. There may be other facts we could take
judicial notice of if necessary, but no fact required by con-
stitution or statute to be officially recorded, and no fact of
such general notoriety as to bring it within the realm of ju-
dicial knowledge, answers the question of whether the publica-
tion of initiatory measure No. 3, prior to the election at which
it was voted upon, was or was not made as the constitution
and statute provide.

The supreme court of Arizona has considered this ques-
tion in substance, in *Allen v. State*, 14 Ariz. 458, 130 Pac.
1114, 44 L. R. A. (N. S.) 468, where there was drawn in
question a referendum measure submitted to the electors un-
der a constitutional initiative and referendum provision in
substance the same as our own. Unless there is a distinction

to be drawn between initiative and referendum measures, which we are unable to see, that decision seems directly in point so far as the principle here invoked is concerned. The approval of the measure by the electors as enacted by the legislature of Arizona, it being subject to referendum and its operation suspended by petition therefor, was challenged upon the ground, among others, of want of sufficient legal publicity prior to the election at which it was voted upon. In disposing of such challenge and declining to look behind the records showing the enactment of the measure by the legislature, the referring of the same to the people and the returns of the referendum election as evidenced by the governor's proclamation thereof, the court said in part, at pages 465, 467 and 479:

"This brings us to the second contention of appellant, wherein he asserts chapter 82 did not receive the publicity provided by law. From the view we take of this question, we deem it unnecessary to discuss what the law requires in that regard. Nor do we propose to go into the details of what was done or not done by the administrative officers in the matter of giving publicity to the measure. We believe that we are precluded from doing so on grounds of sound public policy, logic, reason, and by the law itself. . . .

"All political power is inherent in the people, and governments derive their just powers from the consent of the governed. This is not a mere metaphor, that sounds pleasing to the ear, nor is it a maxim that may not have a concrete application; but it is a vital principle, adhered to in the formation of the government of this state. By their constitution, the legislative authority was vested in a legislature, consisting of a Senate and House of Representatives; but the people reserved the power to propose laws and amendments to the constitution, and to enact or reject such laws and amendments at the polls, independently of the legislature, and they also reserved, for use at their own option, the power to approve or reject at the polls any act, section, or part of any act of the legislature. The people did not commit to the legislature the whole law-making power of the state, but they especially reserved in themselves the power to initiate and defeat legis-

lation by their votes. In this state the legislature and the people constitute the law-making power. This is important when we come to consider the adjudicated cases holding that if the enrollment or original record of the statute is regular on its face—that is, if the act is framed with no infirmity on its face, is duly promulgated, or properly authenticated and deposited in the proper office—it is conclusively presumed to have been regularly enacted, the record is invulnerable to attack, and proves itself. If such sancity and verity may be given to the acts of the delegated representatives of the people in legislative body assembled, it must with clearer reason and with greater force be given to the act of the sovereign itself, the source of all governmental power, the record of which, in its law-making capacity, is authenticated and promulgated as the constitution provides.

"Subdivision 5 of section 1 of article 4 of the constitution provides: 'Any measure or amendment to the constitution proposed under the initiative, and any measure to which the referendum is applied, shall be referred to a vote of the qualified electors, and shall become law when approved by a majority of the votes cast thereon and upon proclamation of the governor, and not otherwise.' In the case at bar we have an act of the legislature deposited in the office of the secretary of state, the legal custodian of the laws. The act is authenticated by the signatures of the speaker of the House of Representatives and the president of the Senate, with the approval of the governor thereon. There is also the proclamation of the governor, giving the whole number of votes cast for and against such measure on a referendum thereof to the people, showing it to be approved by a majority of those voting thereon; the governor declaring in such proclamation the measure to be law.' . . .

"If a properly enrolled and authenticated act of the legislature speaks verity, surely that same act, fortified by the approval of a majority of the qualified voters of the state and the proclamation of the governor, issued under a mandate of the constitution, declaring the act has become and is a law, is doubly strengthened as a record of unimpeachable character. Indeed, we feel that we could rest our decision of this question, without the support of analogous reason as applied to legislative acts, upon the plain language of the constitutional provision that any measure shall become law when ap-

proved by a majority vote and proclaimed as such by the governor. These are mandatory provisions of the constitution, and they attach no other condition to a referred measure becoming a law than approval by the electorate and the governor's proclamation. Other conditions could have been imposed, and their omission must have been intentional, and for the express purpose of preventing judicial interference in matters wholly legislative and executive. We agree with those courts that maintain each department of government should in fact, as well as in theory, be independent of the other. Mandatory provisions of the constitution as to the making of laws are directed to the attention of the legislative department, and are binding on the conscience of those whose duty it is to observe them. This is likewise true of the executive and judicial departments within their sphere. Until the people, through their fundamental law, shall require the courts to supervise and direct the actions of the other departments in the process of making laws, we shall adhere to the theory of government that those departments are responsible to the people for any neglect of duty, and not to the courts, and that their records, when authenticated as required by the constitution and presented to this department, will import absolute verity, and conclude us from going beyond such records to impeach them."

That decision was rested upon the so-called enrolled bill doctrine, adhered to by this court in *State ex rel. Reed v. Jones, supra,* which decision was quoted from by the Arizona court at some length. Now, it is true, as is seen from the above quoted portion of the decision of the Arizona case, that the recall provision of the Arizona constitution, by express words, makes the governor's proclamation the final act in rendering the voice of the people effective touching initiative and referendum measures, while ours provides as to an initiative measure only that such a measure "shall take effect and become the law if it is approved by a majority of the votes cast thereon," and remains silent as to the manner in which the vote of the people shall be officially evidenced.

Now, the enrolled bill doctrine is, at all events, no broader than this; that the courts will not look beyond officially re-

corded acts in determining the question of whether a statute
has or has not been enacted by the legislative power of
the state. Whether the governor's proclamation of the due
enactment of an initiative measure into law by direct vote
of the people would preclude all further inquiry by the
courts as to it having been regularly enacted under our con-
stitution and statute, we need not here decide. In this case,
we do extend our inquiry to facts which the law causes to be
evidenced by official records, and stop there, since there are
no other facts of which we may take judicial notice touching
the question of the due enactment of initiative measure No.
3. All of the facts thus capable of being judicially noticed
by us, as we have seen, point unerringly to the due submission
and enactment of this measure into law. Observations made
by Justice Harlan, speaking for the supreme court of the
United States in *Field v. Clark*, 143 U. S. 649, in which
decision the enrolled bill doctrine is adhered to, are of interest
here. At page 670, the learned justice said:

"We recognize, on one hand, the duty of this court, from
the performance of which it may not shrink, to give full effect
to the provisions of the constitution relating to the enactment
of laws that are to operate wherever the authority and juris-
diction of the United States extend. On the other hand, we
cannot be unmindful of the consequences that must result if
this court should feel obliged, in fidelity to the constitution,
to declare that an enrolled bill, on which depend public and
private interests of vast magnitude, and which has been au-
thenticated by the signatures of the presiding officers of the
two houses of Congress, and by the approval of the Presi-
dent, and been deposited in the public archives, *as an act of
Congress*, was not in fact passed by the House of Representa-
tives and the Senate, and therefore did not become a law."

Manifestly, the holding of the court in that case rests
simply on the broad ground of public policy. This seems evi-
dent from the following observation on page 671:

"Nor does any clause of that instrument [the constitu-
tion], either expressly or by necessary implication, prescribe
the mode in which the fact of the original passage of a bill

by the House of Representatives and the Senate shall be authenticated, or preclude Congress from adopting any mode to that end which its wisdom suggests. Although the Constitution does not expressly require bills that have passed Congress to be attested by the signatures of the presiding officers of the two houses, usage, the orderly conduct of legislative proceedings and the rules under which the two bodies have acted since the organization of the government, require that mode of authentication."

Our attention is called to the decisions of this court in *Wade v. Tacoma*, 4 Wash. 85, 29 Pac. 983, and *State ex rel. Mullen v. Doherty*, 16 Wash. 382, 47 Pac. 958, 58 Am. St. 39, where there were drawn in question the sufficiency of the publication of amendments to the freehold charter of the city of Tacoma prior to the elections at which they were voted upon. In the *Wade* case, the plaintiff, as a taxpayer, was simply seeking an injunction to restrain the city authorities from holding an election, upon the ground of the insufficiency of the publication prior to the election at which the amendment was to be voted upon. The question being in that form, manifestly involved a question of fact, triable as such, since there was not involved the question of the existence of the charter amendment after its adoption; hence there was not presented any question involving judicial notice.

In the *Doherty* case, there was involved the existence of a charter amendment after its adoption, which was challenged upon the ground, among others, of insufficient publication thereof prior to the election at which it was voted upon. The question appears to have been tried in the superior court as an ordinary question of fact. The amendment was sustained by this court. There is nothing in the reported decision indicating that any question of judicial notice was suggested as being involved. Whether the enrolled bill doctrine could be successfully invoked in support of a freehold city charter or an amendment thereto after adoption by vote of the people, we are not here called upon to decide. We

think it plain that no such question has ever been presented to the courts of this state, nor has any decision of the courts of any state come to our notice where any such question was presented.

· A number of decisions have been cited by counsel, dealing with the question of the sufficiency of published notice required to be given preliminary to elections at which special questions such as local option, bond elections, county seat elections, etc., were voted upon. These decisions we regard as of no aid here. They deal almost wholly with pure questions of fact, to be tried as such, and in none of them was the question of judicial notice involved as it is in the problem here for solution. Our decision in *State ex rel. Case v. Superior Court*, 81 Wash. 623, 143 Pac. 461, is in harmony with the conclusion we here reach. While not directly in point, it indicates the limit of judicial inquiry into official acts of a political nature.

We are of the opinion that due publication of initiative measure No. 3, prior to the election of 1914, at which it was voted upon, must now be conclusively presumed to have been made as the constitution and statute require, and that it has not failed of lawful adoption because of want of such publicity.

Contention is made by counsel for appellants that there was not cast, upon the question of the adoption of initiative measure No. 3, the required number of votes, the majority of which must have been favorable to its adoption to enact it into law. This contention is rested upon that provision of the seventh amendment to the constitution reading as follows:

"Any measure initiated by the people or referred to the people as herein provided shall take effect and become a law if it is approved by a majority of the votes cast thereon: *Provided, That the vote cast upon such question or measure shall equal one-third of the total votes cast at such election and not otherwise.*"

The italicized words are particularly relied upon. These words, it is insisted, mean votes to be counted separately for or against each separate measure to be submitted and voted upon at the election. Now, there were nine initiative and referendum measures voted upon by the people at the election of 1914, at which initiative measure No. 3 was voted upon, and the average number of votes cast for and against each of these measures was over 300,000. So that, according to counsel's contention, there must have been cast upon the question of the adoption of initiative measure No. 3 at least one-third of nine times 300,000, that is, one-third of 2,700,000, or 900,000 votes, a majority of which was necessary to the enactment of that measure into law. It matters not whether we regard this as the exact situation in this case or merely as a supposed situation; it, of course, being a possible one, since manifestly there is nothing unlawful in submitting this number of measures at one election. If we were to take into consideration the votes cast for candidates for the various offices at the same time, at the general election, and not regard the election upon these several measures as a special election apart from the general election, as counsel concede it to be, we would have a much more striking example of the absurdity to which their contention leads.

Now, we are informed by the election returns in the office of the secretary of state that there were 381,643 electors voting at the election of 1914, at which initiative measure No. 3 was voted upon. Even if this fact should not be capable of exact demonstration from those records, though such records do show with exactness that 361,048 voters voted upon the question of the adoption of initiative measure No. 3, we know judicially, as a matter of common knowledge, that there are not 900,000 electors in the state of Washington. Common knowledge as to the population of our state tells us of this fact. It is plain, then, that to construe the words "votes cast at such election," as here used, in the narrow sense

contended for by counsel, would absolutely defeat the purpose
of the seventh amendment to the constitution whenever any
considerable number of initiative and referendum measures
were submitted to the people to be voted upon at one election.

Several authorities are called to our attention showing
the meaning of the word "votes" as compared with the words
"voters" or "electors." Doubtless these words, standing
alone, are capable of being differentiated as to their meaning,
but that does not argue that they might not be so used in a
sentence or paragraph of a constitutional provision, read in
the light of its whole context and the manifest purpose that
they would mean the same thing. This, in its final analysis,
is a problem to be solved largely by a resort to common sense,
rather than to refined distinctions as to the meaning of words
viewed apart from the connection in which they may be used.
A review of the authorities cited which are thought to sup-
port the contentions of counsel for appellants we think would
not be profitable here. Indeed, we think they are of no ma-
terial aid. The oft quoted observations of Judge Story in
volume 1 of his work on the Constitution (5th ed.), at § 451,
can well be repeated in this connection as follows:

"Constitutions are not designed for metaphysical or logical
subleties, for niceties of expression, for critical propriety,
for elaborate shades of meaning, or for the exercise of phil-
osophical acuteness or judicial research. They are instru-
ments of a practical nature, founded on the common business
of human life, adapted to common wants, designed for com-
mon use, and fitted for common understandings. The people
make them, the people adopt them, the people must be sup-
posed to read them, with the help of common-sense, and can-
not be presumed to admit in them any recondite meaning or
any extraordinary gloss."

We are of the opinion that the words "votes cast at such
election," as used in the provision of the seventh amendment
to the constitution, above quoted, mean the same as "num-
ber of voters voting at such election"; and that, since more
than one-third of the voters voting at the election of 1914,

at which initiative measure No. 3 was voted upon, voted upon the question of the adoption of that measure, and a majority thereof voted in favor of its adoption, it was thereby constitutionally adopted within the meaning of the seventh amendment, in so far as the required number of votes is concerned.

It is contended by counsel for the appellants that initiative measure No. 3 is unconstitutional in that the concluding section thereof reads:

"This act shall take effect and be in full force and effect from and after the first day of January, 1916." Laws of 1915, p. 17, § 33.

The argument is that, because this is a postponement of the date on which the provisions of the measure become enforcible, for more than thirty days beyond the date of the election of 1914, at which it was voted upon, it violates that provision of the seventh amendment to the constitution reading as follows:

"Such measure shall be in operation on and after the thirtieth day after the election at which it is approved."

Now, if this were a controversy as to when the provisions of initiative measure No. 3 became enforcible, and the state and county officers were attempting to enforce its provisions prior to the first day of January, 1916, there would be drawn in question the constitutionality of the concluding section, above quoted. But it is not pretended that there is any threat on the part of the public officers to seek enforcement of its provisions prior to the first day of January, 1916, when, by the terms of this section, they become enforceable. The real question then is, not so much as to the constitutionality of the concluding section of the law above quoted, but whether, if that section be held unconstitutional, such holding would have any effect upon the constitutionality of other provisions thereof. Manifestly it would not, by the express terms of § 26 of the law, which reads:

"If any provision or section of this act shall be held void or unconstitutional, all other provisions and all other sections of the act, which are not expressly held to be void or unconstitutional, shall continue in full force and effect." Laws of 1915, p. 15, § 26.

Now, it seems plain that, by the provisions of the seventh amendment to the constitution above quoted, this measure became a law on the thirtieth day after the election of 1914, at which it was voted upon by the people and adopted, regardless of how we might answer the question as to when its terms became enforceable. Whether the concluding section be unconstitutional or not would not change the date of the coming into existence of the law. Many laws may be found among our statutes prescribing rules of future conduct, which rules are unenforceable until a given date; and yet it could not be successfully contended that any part of the law was, for that reason, non-existent until the date of the enforcibility of one or more, or even all, of such prescribed rules of future conduct.

It is contended by counsel for appellants that initiative measure No. 3 is unconstitutional in that it violates the equal privileges and immunities, and the equal protection of the laws, guaranties of the state and Federal constitutions. It is insisted in this behalf that the measure is discriminatory and makes unconstitutional classification as to persons, in that it permits registered druggists and pharmacists to sell intoxicating liquor for mechanical and medicinal purposes, under certain conditions, while such privilege is withheld from others. This question is not new to the courts. Among other decisions in which this contention of counsel for appellants has been answered, we note as of special interest and directly in point, the decision of the supreme court of Kansas in *Intoxicating Liquor Cases*, 25 Kan. 751, 37 Am. Rep. 284, wherein Justice Brewer, speaking for the court, at page 761, observed:

"Here the sale of liquor being allowed for medical pur-
poses, druggists who deal in medicines are properly named
as a suitable class to whom to intrust such sale. The law
does not attempt to prescribe who may and who may not be-
come druggists. That question each individual settles for
himself. It simply says that only druggists shall sell liquor.
It is like a law which should forbid any but licensed engineers
from running the engine of a passenger train, any but li-
censed attorneys from appearing for clients in a court of
record, any but medical graduates from engaging in the
practice of medicine. No law of this kind interferes with in-
dividual liberty in its true sense. Such laws protect the pub-
lic only in matters involving risk and danger from the acts
of unfit and improper persons. They cannot be adjudged
class legislation in any objectionable and unconstitutional
sense of the term."

We have recently had occasion to dispose of similar claims
made under these constitutional guaranties in *Barker v.
State Fish Commission, ante* p. 73, 152 Pac. 537, wherein we
reached a conclusion quite in harmony with the view ex-
pressed by Justice Brewer in the Kansas case. We there
noticed the earlier decisions of this court, all of which are in
harmony therewith. In *Eberle v. Michigan*, 232 U. S. 700,
706, having under consideration a contention in substance
the same as that here presented, Justice Lamar, speaking for
the court, said:

"Nor can the judgment be reversed because the original
act, while prohibiting liquor to be sold by merchants per-
mitted it to be sold by druggists for medicinal, mechanical or
scientific purposes. The contention that this was an unlaw-
ful discrimination is answered by *Kidd v. Pearson*, 128 U. S.
1; *Rippey v. Texas*, 193 U. S. 504; *Lloyd v. Dollison*, 194
U. S. 445. These cases show that the state may prohibit the
sale of liquor absolutely or conditionally; may prohibit the
sale as a beverage and permit the sale for medicinal and like
purpose; that it may prohibit the sale by merchants and
permit the sale by licensed druggists."

It seems quite clear to us that this measure does not violate
any constitutional guaranties of the nature invoked by this

contention. These observations, we think, dispose of other contentions of counsel as to claimed unconstitutional classification of persons in certain other respects.

It is contended that initiative measure No. 3 is void in that it interferes with interstate commerce. It may be well doubted that appellants are in position to make this challenge to the law because of want of sufficient allegations in their complaints. They are, in any event, in no position to make such contention in this form of action, in so far as shipment into the state for their personal use is concerned. This question we leave wholly undecided as not being properly before us. We may assume, for argument's sake, that, in so far as shipment of liquors into the state for sale and disposition as a part of their business is concerned, the allegations of the complaints are sufficient to entitle appellants to raise this question. It seems to us, however, that the question of the validity of this law, in so far as it is claimed to interfere with interstate commerce is concerned, is fully answered adverse to the contentions of counsel for appellants by the express terms of the so-called Webb-Kenyon act of Congress, of March 1, 1913, which reads:

"An Act Divesting intoxicating liquors of their interstate character in certain cases.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received,

17—88 WASH.

possessed, sold, or in any manner used, either in the original package or othewise, in violation of any law of such State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is hereby prohibited." 37 U. S. Stat. at L., p. 699, ch. 90.

Nothing could seem plainer than that, by the terms of this act of Congress, the dealing in and shipment of intoxicating liquors are no longer exempt in any degree from state regulation by the fact that such liquor may be an article of interstate commerce. In other words, intoxicating liquors are, by the terms of this act, divested of their interstate character, in so far as the power of the state to regulate the sale and disposition thereof, and the shipment into the state for that purpose, is concerned. This act has been given full force and effect by the courts, even as against the contention that it is in violation of the interstate commerce clause of the Federal constitution. The supreme court of Alabama so held in *Southern Express Co. v. State* (Ala.), 66 South. 115, and *Southern Express Co. v. Whittle* (Ala.), 69 South. 652, in which cases the subject was examined at length. Touching the effect of the act, in the *Whittle* case, Justice McClellen, speaking for the court, said:

"The Webb-Kenyon Law seems to this court, as it did to the court in the Fourth circuit (219 Fed. 801, 135 C. C. A. 464, Judge Woods writing) that 'the terms of the statute are so plain and unambiguous that we are unable to perceive that its interpretation requires any resort to construction.' It is a prohibitory enactment. Its plainly declared purpose is to divest intoxicating liquors of their interstate character, with reference to interstate commerce, 'in certain cases.' In the certain cases contemplated and described therein, intoxicating liquor is not and cannot bcome the subject of and be protected as lawful interstate commerce. *Sou. Express Company v. State*, 66 So. 115, 118, 119. It is, in those certain cases, 'forbidden commerce.' In the certain cases described intoxicating liquors must be, can only be, regarded and treated, when their movement is from one state into another, as if the Constitution had not contained the clause commit-

ting to the Congress the exclusive right to regulate interstate commerce."

In *State of West Virginia v. Adams Express Co.*, 219 Fed. 794, the circuit court of appeals of the fourth circuit, answering a challenge to the constitutionality of the act, Judge Wood, speaking for the court, said:

"The constitutionality of the Webb-Kenyon statute is attacked on the ground that it is an attempt by Congress to confer on state legislatures the power to regulate interstate commerce. This, we think, is a complete misapprehension. That the Congress has power to outlaw and exclude absolutely or conditionally from interstate commerce intoxicating liquors or any other deleterious substance has been very often decided. *Ex parte Rahrer* [140 U. S. 545], *supra; Lottery Case*, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492; *Hoke v. United States*, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913 E. 905; *Hipolite Egg Co. v. United States*, 220 U. S. 45, 31 Sup. St. 364, 55 L. Ed. 364. The distinction is between things deleterious and things beneficial or innocuous. The power to regulate is the power to make reasonable rules of admission or exclusion. The power to exclude intoxicants absolutely or conditionally does not import the power to exclude sound wheat."

The supreme courts of Iowa and Delaware are in harmony with these views touching the constitutionality of the Webb-Kenyon law, as evidenced by the decisions in *State v. United States Express Co.*, 164 Iowa 112, 145 N. W. 451, and *State v. Grier* (Del.), 88 Atl. 579. We conclude that initiative measure No. 3 does not unlawfully interfere with interstate commerce.

Some other constitutional questions are presented by counsel for appellants, but we think they are not such as appellants may raise in this form of action. Those questions do not involve property rights of such nature as to entitle appellants to *relief by injunction* against the enforcement of the provisions of initiative measure No. 3. Whatever our views might be on those questions would not render the pro-

visions of the law we have discussed unconstitutional, in view
of the provisions of section 26 above quoted.

We are of the opinion that initiative measure No. 3 is an
existing law of the state, and that, in so far as its provisions
are here drawn in question, their enforcement will not violate
any of the rights guaranteed to appellants by either the
state or Federal constitutions. The judgment of the superior
court, refusing to enjoin the state and county officers from
enforcing the law, is affirmed.

MORRIS, C. J., ELLIS, HOLCOMB, MAIN, and MOUNT, JJ.,
concur.

CHADWICK, J. (concurring specially)—The decision of the
court seems to be well founded in all respects, excepting only
the holding that the court cannot consider the admission that
initiative measure No. 3 was not published for the time re-
quired by law, and cannot take judicial knowledge of the
fact. The purpose of the amendment was to maintain the
spirit of the constitution and to insure an informed electorate.
The duty of giving such notice was put upon the secretary
of state. He did not give the notice required by the consti-
tution, although it is provided in terms that such duties are
mandatory. It is stipulated that he did not give sufficient
notice.

I had hitherto understood that courts would consider, as
a part of the record, stipulated facts. It is held that we will
not do so in this case. I had also thought the law to be that
we could judicially notice any fact that went to a question
of observance or nonobservance of a provision of the consti-
tution, mandatory in character, by an officer high in station
and whose act affected the whole public, and when the fact
was known of all men. The amendment to the constitution
providing for the initiative and referendum specifically di-
rects that the legislature shall provide a means and method
for notice to the people of laws submitted under those meas-
ures. It says:

"The legislature shall provide methods of publicity of all laws or parts of laws, and amendments to the constitution referred to the people with arguments for and against the laws and amendments so referred, so that each voter of the state shall receive the publication at least fifty days before the election at which they are to be voted upon." Laws 1911, p. 136, § 1.

The legislature did as was directed, and I had understood the rule to be that a statute passed in obedience to a constitutional amendment had the force and effect of the constitution from which it sprang. In other words, it is the thing that makes the constitution efficient.

It had seemed to me that this provision of the constitution, as amended by the initiative and referendum amendment, was not merely directory, or a thing to be disregarded in whole or in part. There was a controlling reason why those who formulated it provided that notice should be given, and that it should be given for a definite time. They well understood, for it has been observed by every statesman and philosopher who has inquired into the theory and possible workings of the scheme, that it might be subject to abuses, and that laws proposed under it might be misrepresented, or possibly voted upon without any guide whatever unless the people were guaranteed ample opportunity to know and understand that which they were voting upon.

The urgent arguments made against the initiative and referendum have been that the measure would reduce our state government to the level of a democracy. The proposers knew that, in the absence of a positive constitutional guarantee, a law might go to the people for their judgment, determination and decision with no means of acquiring certain information as to the terms of the law or the arguments of those who had a real interest for or against it. They knew that the present strength of the initiative and referendum, as well as its retention as an instrumentality of government, depended, not merely upon the participation of the people,

but upon intelligent participation, and it is not out of place
to say that one of the reasons for the adoption of the initia-
tive and referendum was that many people believed that the
legislative body had not been entirely responsive to the pub-
lic will, and had passed unwise and ill-considered legislation,
and its proposers were careful to provide that the people
should have every opportunity to test the merit and wisdom
of a proposed law.  They foresaw that an instrument de-
signed to protect the rights of the people, in the event that
no notice and publication of the proposed measures was pro-
vided for, would be subject to abuse by those who might pro-
pose laws to promote selfish interests, and by the means of
unauthorized notices and publications, deceive and mislead
the people.

We meet this situation.  It is admitted by counsel that
the constitution has not been observed.  It is stipulated in
writing that it was not.  The act of a public officer, a high
public official, is questioned.  His act involves a nonobserv-
ance of a duty imposed by the constitution, and touches the
whole people, and the whole public has an interest in his act.
The act of omission is known and admitted of all men, that is
to say, is a matter of common knowledge.  I think there is
no instance in the books where, under like circumstances, a
court has refused to judicially know what they know as men.

If a court cannot accept stipulated facts or judicially
recognize a breach of a duty made mandatory by the con-
stitution, I can imagine no case where it would be justified
in resorting to judicial knowledge.  The opinion, in this re-
spect, does not, in my judgment, rest upon a readjustment
of old principles to new conditions.  It is rather an abandon-
ment of old principles, for any decision that makes it pos-
sible for an administrative officer to turn a mandate of the
whole people into a mere direction does not tend to the se-
curity of our constitution.

We have laid down a rule that will be as readily seized
upon to sustain an evil law as to uphold a good one.  The

rule must work both ways. If we could know as judges what we and all men know as men, we would undoubtedly follow an unbroken line of decisions from *Wade v. Tacoma,* 4 Wash. 85, 29 Pac. 983, to *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998, decided finally while this case was under consideration, and hold that measure No. 3 was not legally adopted.

I have urged these things. They are fundamental principles and might be sustained by the writings of men learned in the law from Aristotle to the present day, but they have not commended themselves to my associates. Law is declared in several ways, one of which is through the decisions of the courts upon controverted questions. This case involves a pure question of law upon a political question which must be settled by a majority vote of the judges.

"When many persons equal in virtue appeared at the same time, they brooked not a superiority, but sought after equality  .  .  .

"No one then denies that it is necessary that there should be some person to decide those cases, which cannot come under the cognizance of a written law; but we say that it is better to have many than one; for every one who decides according to the principles of the law, decides justly. Yet surely it seems absurd to suppose, that one person can see better with two eyes, and hear better with two ears, or do better with two hands and two feet, than many can do with many  .  .  ." Aristotle's Politics, Book III, Chapters XV, XVI.

Seven of my associates find no violation of the constitution in the adoption of the questioned law, or rather, they hold that the court is powerless to notice and correct the admitted omission to observe its terms, and I feel that I can do no better than to say that I yield my judgment to that of the majority, as I would follow a questioned decision under the doctrine of *stare decisis,* and concur in the result, not because it is the law as I had understood it, but because it has been so declared by a competent tribunal.

FULLERTON, J. (concurring)—I am unable to agree with the majority in the reasons upon which some of the questions discussed in the foregoing opinion are rested, although I am content with the conclusion finally reached. I therefore concur in the result.